HERMAN REIMANN, INDIVIDUALLY AND FORMERLY TRADING AS OAKHURST RECREATION CENTER, PLAINTIFF-APPELLANT, v. MONMOUTH CONSOLI-DATED WATER COMPANY, A BODY CORPORATE, DE-FENDANT-RESPONDENT.

Argued February 4, 1952—Decided February 14, 1952.

*Mr. David Goldstein* argued the cause for appellant (*Mr. William Miller* of the New York Bar on the brief; *Messrs. Goldstein & Novogrod* and *Messrs. Budd & Larner*, attorneys).

*Mr. Sidney P. McCord, Jr.*, argued the cause for respondent (*Mr. Maurice A. Potter* on the brief; *Messrs. Starr, Summerill & Davis* and *Messrs. Potter & Fisher*, attorneys).

The opinion of the court was delivered by
CASE, J. Plaintiff suffered a fire loss said to have been due to lack of water and pressure at fire hydrants served by the defendant water company. He instituted action by a complaint which defendant attacked upon the ground that it did not state a claim upon which relief could be granted. On motion the court rendered judgment for the defendant. This appeal brings up that judgment.

The complaint alleges that plaintiff owned and operated a recreation center in the Township of Ocean, Monmouth County. Near the said premises were two fire hydrants, located respectively at distances of 100 feet and 200 feet. On July 11, 1949, a fire broke out on the premises and the

township volunteer fire department responded with its equipment. The water volume and pressure were insufficient, even with the "boost" from the fire apparatus to combat the fire. As a result the building and contents were completely destroyed. The defendant company was a public utility engaged in the supply and distribution of water. It exercised exclusive control over the fire hydrants and the exclusive function of furnishing water thereat for the inhabitants and property owners of the township and for the fire department, and it had knowledge of the existence of plaintiff's building and of the business conducted there. Such is the substance of the allegations.

The complaint contained three counts, all sounding in tort. The first count charged that the water company, by reason of the matters briefly reviewed above, represented that water would be supplied at the hydrants in reasonable volume and pressure for the extinguishment of fires in business structures such as plaintiff's, and thereby induced reliance thereon by plaintiff and others and also thereby, to defendant's knowledge, induced the township to make no other provision for a supply of water; that defendant thereby assumed and owed to plaintiff a correlative duty of reasonable care to prevent the type of harm suffered by plaintiff; that defendant breached its duty in that prior to and at the time of the fire, and especially after knowing of the outbreak of the fire, defendant failed to supply a sufficient volume of water or pressure at the hydrants for the ordinary purposes of those hydrants, this notwithstanding the company had notice by reason of a fire a few weeks earlier that the volume and pressure of water at hydrants in the vicinity were insufficient and that plaintiff's property loss was a proximate result of the company's negligence. It is not to be understood that the complaint charged the company with making an actual representation in manner above set forth; it merely alleged the pleader's conclusion that the congeries of facts which we have related amounted to a representation. The count was intended to ground in nonfeasance.

The second count was pleaded as a misfeasance. It amplified the charge of negligence by alleging that the company, although it knew of the existence of a volunteer fire department and of the reliance of the department in case of fire upon an adequate supply of water, had, several hours before plaintiff's fire, so controlled the water-supply mechanism that there was not a sufficient volume of water or pressure, and that although informed of the fire at the outbreak permitted two hours to pass before providing proper quantity and pressure, and that in consequence of plaintiff's reliance upon defendant's due performance of its duty and of defendant's disregard thereof the property losses were incurred. At the argument it was conceded that the reduction of quantity and pressure was a regular daily practice following the peak load of the day and had no purposeful connection with the conflagration.

The third count repeated the allegations of the other counts and laid its damage in business losses suffered by reason of the same alleged faults.

Before there can be either nonfeasance or misfeasance there must be a duty. Had there been a contract between the company and the owner whereby the company undertook to furnish water to the owner with a pressure sufficient for fire purposes, followed by a breach, liability would have been according to the terms of the contract. *Middlesex Water Co. v. Knappmann Whiting Co.*, 64 *N. J. L.* 240 (*E. & A.* 1899) ; *Buchanan & Smock Lumber Co. v. East Jersey Water Co.*, 71 *N. J. L.* 350 (*Sup. Ct.* 1904). There was no contract, therefore no duty imposed by contract. There is no applicable statute and therefore no statutory duty. Plaintiff argues for a common law duty, but the Court of Errors and Appeals held in *Baum v. Somerville Water Company*, 84 *N. J. L.* 611 (1913), upon facts that bear a striking resemblance to the facts of the present case, that the common law does not impose a duty upon a company serving a municipality with water to provide a sufficient supply of water at sufficient pressure at fire hydrants to extinguish a fire which is

destroying an individual's property. Very plainly it holds that in the absence of contract no liability exists. Appellant seeks to assail the force of that decision, by arguing that in the instant case distinguishing circumstances were present, as that some hours before the fire the company had reduced quantity and pressure, and that the defendant "interfered" with the volunteer fire department in that it prevented the firemen from rendering their ordinary assistance in putting out the fire. We have stated the reason for lowering water supply and pressure. No wantonness or malicious intent is charged. The act was in usual course. "Interference," if that word is properly descriptive, was, specifically, present in the *Baum* case. The argument is unconvincing.

Another pertinent decision, tried at the circuit and not brought up, but never questioned, is *Atlas Finishing. Co. v. Hackensack Water Co.,* 10 *N. J. Misc.* 1197 (*Sup. Ct. Circ.* 1932), which held that while a water company may expressly contract to furnish water to a consumer in sufficient quantity and at sufficient pressure to extinguish fires, nevertheless, such an obligation is not implied from the relationship of water supply company and customer and can exist only where, in addition to the ordinary duty of supplying water for general use, the company by express contract assumes the additional obligation of furnishing it in sufficient quantity to protect specific property from fire; further, that the primary business of a water company is to furnish water as a commodity and not to extinguish fires, and that no common law duty arose even though the company had connected its water system with pipe lines, including fire hydrants, on the private property of the owner who thereafter met with a fire loss because of insufficient supply and low pressure. Even where a water company makes a contract with a municipality to deliver a supply of water to the city for fire hydrants at a specified pressure the company is not liable to an inhabitant of the city on that contract for a loss which he sustains through the company's failure to perform. *Hall v. Passaic Water Co.,* 83 *N. J. L.* 771 (*E. & A.* 1912).

The law in this State as heretofore pronounced is entirely clear. Appellant, although arguing to the contrary, apparently anticipates that such may be the holding and thereupon asks that the old law be discarded and a modern principle adopted—a prayer which could more properly be addressed to the Legislature. The *Baum* case was decided nearly 40 years ago and has never been attacked or weakened. Water companies sell a commodity and their rates have been established and approved by the Board of Public Utility Commissioners upon that basis, not upon the assumption that, without an undertaking to that end, they are responsible for fire losses. A way of business has grown up on that understanding. There are many companies whose function is to insure against fire, and the property owner may protect himself fully against fire loss by contract with those companies. In the making of such a contract the premium varies with the risk and with the character of the property insured, and the insurer may limit its liability. Water rates are uniform; they do not rise or fall with the inherent danger. If the principle for which appellant contends were the law there would be no predetermined limit of liability. There are large water companies and small water companies; companies with ample supply of water and companies with limited and inadequate supply and perhaps with inability to increase the water resources; companies of such size that a considerable verdict against them for a fire loss would bankrupt them or leave them insufficiently financed to meet the general needs of their communities. Important as is a sufficient flow of water, under adequate pressure, for fire purposes, that is not the only use nor, indeed, the most imperative use, for which a municipality needs water.

If such a broad liability as that sought by the plaintiff were established, the ensuing litigation would doubtless be great. Fire insurance companies, entitled to subrogation to their insureds' claims, could, if they would, sue, whether successfully or not, upon settling a fire loss with their insureds in accordance with their contract liability. No one can fore-

tell the degree of confusion which would follow so revolutionary a decision; a decision which would work backward as well as forward; it would unsettle the past as well as be effective in the future.

We conclude that if our law is to be overturned, the result should be effected by the Legislature, vested with the law-making power. Statutory changes are accompanied by publicity and an opportunity for all interested persons to be heard; incidents which are quite impossible in a suit between parties.

The majority rule in this country appears to be consistent with our New Jersey holdings. *Cf. H. R. Moch Co., Inc., v. Rensselaer Water Co.,* 247 *N. Y.* 160, 159 *N. E.* 896 (*Ct. App.* 1928); *Nickerson v. Bridgeport Hydraulic Co.,* 46 *Conn.* 24 (*Sup. Ct. Err.* 1878); *Hone v. Presque Isle Water Co.,* 104 *Me.* 217, 71 *A.* 769 (*Sup. Judic. Ct.* 1908); *Beck v. Kittanning Water Co.,* 8 *Penn. Cas. (Sadler)* 237, 11 *A.* 300 (*Sup. Ct.* 1887); *Blunk v. Dennison Water Supply Co.,* 73 *N. E.* 210 (*Sup. Ct. Ohio* 1905); *Trustees, De Pauw Church v. New Albany Waterworks,* 140 *N. E.* 540 (*Sup. Ct. Ind.* 1923); *Eaton v. Fairbury Waterworks Co.,* 21 *L. R. A.* 653 (*Neb. Sup. Ct.* 1893).

The judgment below will be affirmed.

VANDERBILT, C. J. (dissenting). Under *Baum v. Somerville Water Co.,* 84 *N. J. L.* 611 (*E. & A.* 1913), the defendant water company, in the absence of an express contract with a property owner and a breach thereof, has no obligation to furnish water with sufficient pressure and in sufficient quantity for fire fighting purposes. Because I am of the opinion that the rule in the *Baum* case is repugnant not only to fundamental concepts of substantial justice but to modern principles of tort liability, I am constrained to dissent from the opinion of the majority and to state the reasons why I think the rule should be discarded in favor of one in keeping with the needs of the times.

## I.

The defendant water company, although a private corporation, is engaged in a business peculiarly associated with and affecting the public interest. It is organized under and exists by virtue of special statutory provisions, *R. S.* 48:19–1 *et seq.* It is, moreover, a public utility subject to the general supervision of and regulation by the Board of Public Utility Commissioners, *R. S.* 48:2–13. Like all public utilities it enjoys extensive privileges by reason of the franchise granted it by the State. Among them are the general power to take and divert springs and streams, to construct reservoirs, and to lay pipes and conduits at such times and in such places as shall be necessary and proper to enable it to carry out its purposes, *R. S.* 48:19–13; the right to enter upon any lands within the area of its operations for the purpose of making any necessary examinations, explorations, measurements or levels, *R. S.* 48:19–14; the right to take by condemnation lands and waters necessary to carry on its business, *R. S.* 48:19–15, including the right to acquire by condemnation new or additional sources of water supply, *R. S.* 48:19–20 and *R. S.* 58:6–1; the right to lay pipes beneath public roads, streets and alleys free from all charge by any person or body politic for the privilege, and also the right to construct and maintain hydrants along such streets and alleys, *R. S.* 48:19–17.

In return for these peculiar and special privileges conferred by the State and enjoyed by a water company as a public utility, it is only reasonable to conclude that on entering into business it assumes a concomitant duty to the public it serves to furnish water of pure quality in sufficient quantity and at sufficient pressure to meet ordinary domestic, business and municipal requirements, including the furnishing of water for the extinguishment of fires. If this be so, it follows that for a failure to perform that duty with reasonable care it subjects itself to liability to those injured as a result of its failure.

While this duty of care with respect to the furnishing of water in sufficient quantity and at sufficient pressure to fight ordinary fires has not previously been recognized by the courts of this State, the analogous duty to use due care in the furnishing of water free from contamination has been recognized. In the case of *Jones v. Mt. Holly Water Co.,* 87 *N. J. L.* 106 (*Sup. Ct.* 1915), the defendant company was held liable for negligence in supplying water contaminated with paratyphoid germs. Other jurisdictions, though a minority, have recognized the duty and imposed liability for negligence in the supplying of water for the extinguishment of fires, *Mugge v. Tampa Water Works Co.,* 42 *So.* 81 (*Fla.* 1906); *Fisher v. Greensboro Water Supply Co.,* 38 *S. E.* 912 (*N. C.* 1901); *Harlan Water Co. v. Carter,* 295 *S. W.* 426, 428 (*Ky.* 1927). A similar conclusion was arrived at by the United States Supreme Court in *Guardian Trust & D. Co. v. Fisher,* 200 *U. S.* 57, 68, 50 *L. Ed.* 367, 374 (1906), wherein it was stated:

"* * * if the company proceeds under its contract, constructs and operates its plant, it enters upon a public calling. It occupies the streets of the city, acquires rights and privileges peculiar to itself. It invites the citizens, and if they avail themselves of its conveniences and omit making other and personal arrangements for a supply of water, then the company owes a duty to them in the discharge of its public calling, and a neglect by it in the discharge of the obligations imposed by its charter, or by contract with the city, may be regarded as a breach of absolute duty, and recovery may be had for such neglect. The action * * * is an action for tort. * * * Even if the water company was under no contract obligations to construct waterworks in the city or to supply the citizens with water, yet having undertaken to do so, it comes under an implied obligation to use reasonable care, and if through its negligence injury results to an individual it becomes liable to him for the damages resulting therefrom, and the action to recover is for a tort, and not for breach of contract."

This view is likewise supported by Corbin, Liability of Water Companies for Losses by Fire, 19 *Yale L. J.* 425 (1910) and Seavey, Reliance upon Gratuitous Promises or Other Conduct, 64 *Harv. L. Rev.* 913, 920 (1951), Principles of Torts, 56 *Harv. L. Rev.* 72, 76 (1942), Mr. Justice Cardozo and the

Law of Torts, 52 *Harv. L. Rev.* 372, 392 (1939). The fact that these cases and authorities do not represent the majority view in this country does not mean that their point of view should be ignored, for as stated in *Gorrell v. Greensboro Water-Supply Co.,* 32 *S. E.* 720, 722 (*N. C.* 1899):

"They are to be weighed, not counted. We should adopt that line which is most consonant with justice and the 'reason of the thing'."

In determining the rule to be followed in this State it should prove helpful to inquire into the circumstances surrounding the decision in *Baum v. Somerville Water Co., supra,* on which the majority here rely. It had previously been recognized in *Middlesex Water Co. v. Knappmann Whiting Co.,* 64 *N. J. L.* 240 (*E. & A.* 1899); *Buchanan & Smock Lumber Co. v. East Jersey Water Co.,* 71 *N. J. L.* 350 (*Sup. Ct.* 1904); and *Hall v. Passaic Water Co.,* 83 *N. J. L.* 771 (*E. & A.* 1912), that where there was an express contract between the company and the property owner whereby the company undertook to furnish water for fire fighting purposes, it would be liable for a loss occasioned by a breach thereof, but in the latter two cases it was held that in the absence of any such breach of a contract to which the plaintiff was a party there could be no recovery. This constituted the basis of the decision in *Baum v. Somerville Water Co., supra.*

The rule in those cases may have had its foundation in reason, for at the time the causes of action there involved arose the applicable statute relating to water companies, now *R. S.* 48:19–18, provided:

"Each company organized under this chapter may sell and dispose of the water issuing from its reservoirs, aqueducts or pipes for such prices, or quarterly or annual rents and such restrictions as they may think proper."

There was at the time no Board of Public Utility Commissioners and the rates charged and the service rendered by water companies were solely matters of contract between the

water company and the property owners in the area it served. They were free to contract without regulation by the State. In those circumstances the property owner could expect to receive by way of water service only that for which he had contracted to pay.

Such is not the situation today. By *L.* 1910, *c.* 41, and then by *L.* 1911, *c.* 195, both of which were enacted after the cause of action had arisen in each of the four cases previously mentioned, the Legislature created the Board of Public Utility Commissioners and charged it with the general supervision, regulation and control of all public utilities, which term was defined specifically as including water companies. Included within the jurisdiction of the Board of Public Utility Commissioners was the power and the duty to regulate both the rates charged and the service furnished by water companies, *R. S.* 48:2–21, 23, 25. Water companies and property owners were no longer free to contract as they saw fit. As is the case with all other public utilities, the public as a matter of practical necessity came to rely not upon private contract but upon the Board of Public Utility Commissioners to insure the receipt of safe and adequate service and to fix fair and reasonable rates for the service rendered. Today a property owner stands in the same relation to a water company as a traveller does to a bus company; he accepts the service that is offered and pays the price that is fixed by the Board of Public Utility Commissioners. Such a situation is inherent in the very nature of a public utility which enjoys a public monopoly and is subject to public regulation.

In these circumstances differing radically from those in which the earlier cases were decided, can it reasonably be said that the rule of law which was applicable formerly is still binding on us today? Must not consideration be given to the change in the status of water companies under the Public Utility Acts of 1910 and 1911 and the changed relationship between water companies and property owners resulting therefrom? To fail to do so would not speak well for

the nature of the common law which requires that each time a rule of law is applied it be scrutinized carefully to make sure that conditions have not so changed as to make its further application the instrument of injustice. The regulation of public utilities by the State has superseded the "freedom of contract" so-called that was the major premise of the *Baum case* and the earlier decisions. In the circumstances of the present case I am convinced that since the decision was rendered in *Baum v. Somerville Water Co., supra,* the statutory law of this State as to water companies has so changed as to make the rule there laid down no longer acceptable.

## II.

It is well recognized in the field of torts today that a duty and a resulting liability for failure to exercise due care in the performance thereof may exist where there is no privity of contract between the parties and where there formerly existed no such duty at common law. The common law is subject to change and has been changing just as has the environment in which it exists. Actionable negligence today is frequently predicated on a duty of care which arises out of an implied representation which induces reliance. Thus in the celebrated opinion of Judge Cardozo in *MacPherson v. Buick Motor Co.,* 111 *N. E.* 1050 (*N. Y.* 1916) liability was imposed on a manufacturer in a suit brought by the ultimate purchaser of its product in the absence of any privity of contract. In rejecting its long established rule in favor of the doctrine of the *MacPherson* case, the highest court in Massachusetts recently stated in *Carter v. Yardley & Co., Ltd.,* 64 *N. E.* 2d 693, 700 (*Mass.* 1946):

"The time has come for us to recognize that that asserted general rule no longer exists. In principle it was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We now abandon it in this Commonwealth."

The United States Court of Appeals for the Third Circuit in holding a manufacturer of a glass bottle liable to a remote

third party with whom it had no direct dealings had this to say in *Diesbourg v. Hazel-Atlas Glass Co.,* 176 *F.* 2d 410, 411 (1949.) :

"Defendant says that it is not liable because there is no privity between it and the plaintiff. It acknowledges the existence of the well known case of *MacPherson v. Buick Motor Co.* * * * but says that while that decision may be applicable to an automobile wheel, it is not applicable to a glass bottle. The defendant misapprehends what has been going on in tort law since that case was decided."

In the instant case it is alleged in the complaint that the defendant has held itself out as a supplier of water, has maintained mains and fire hydrants and impliedly has represented to the public and its customers, among whom is the plaintiff, that it will maintain water pressure for ordinary activities and emergencies, among them the fighting of fires. The public and its customers have relied on this holding out and have maintained a fire department whose equipment is designed to utilize water from the defendant's hydrants. Moreover, because of this reliance on the defendant's holding out of itself as a supplier of water for fire fighting purposes, they have not attempted to make provisions for other sources of water for such purposes, as they might otherwise have done. The defendant had knowledge of this situation and it must have realized that if it should fail to maintain sufficient water pressure at its fire hydrants for ordinary firefighting purposes, the efforts of the fire department to subdue a fire on the premises of the plaintiff or others would be futile and their loss greatly magnified. In these circumstances it is clear that if by its negligence the defendant fails to perform this duty which it has assumed it is liable to those such as the plaintiff whose property has been destroyed by fire, assuming, of course, that it can be shown that adequate water pressure would have averted or minimized the loss.

The situation in the instant case is analogous to that in the *MacPherson* case; or to that in *Erie Railroad v. Stewart,* 40 *F.* 2d 855 (*C. C. A.* 6 1930), *cert.* denied, 282 *U. S.* 843,

75 *L. Ed.* 748 (1930), where the defendant was held liable because of the temporary absence of a watchman, even though the law did not require a watchman to be present; or to *Knight v. Sheffield Corp.* (1942), 2 *All E. R.* 411, where the defendant was held liable for failure to perform the self-imposed duty of lighting an obstruction in the highway when the public had come to rely on such lighting. The duty is imposed not because of statute or contract, but because of a holding out and a reliance thereon. In some respects it is not dissimilar to the duty imposed on a rescuer or volunteer to use due care on his errand of mercy.

It therefore follows that the doctrine of the *Baum* case should be overruled and that water companies should be subject to the same duty and liability for the breach thereof as others. The negligent failure to maintain adequate pressure at its hydrants for ordinary fire fighting purposes should result in liability if proven to be causally related to the loss.

### III.

In the instant case, instead of merely relying on the nonfeasance of the defendant, the plaintiff in his second count has alleged misfeasance or active wrongdoing, in that the defendant knowingly reduced the water pressure at its hydrants to such a point as to make water unavailable for fire fighting purposes. Even a municipality which undertakes to furnish water as a governmental function would be liable for active wrongdoing if it knowingly reduced the pressure so low as to prevent use of water for fire fighting, for it is well established that, while a municipality may be immune from liability for passive negligence or nonfeasance, liability is imposed upon it for misfeasance or active wrongdoing, *Allas v. Borough of Rumson,* 115 *N. J. L.* 593 (*E. & A.* 1935); *Newman v. Ocean Township,* 127 *N. J. L.* 287 (*E. & A.* 1941); *Lovett v. Borough of Keyport,* 133 *N. J. L.* 122 (*E. & A.* 1945); *Truhlar v. Borough of East Paterson,* 4 *N. J.* 490 (1950); *Milstrey v. Hackensack,* 6 *N. J.* 400

(1951); *Kress v. City of Newark,* 8 *N. J.* 562 (1952). Moreover, if a third party negligently interfered with the defendant's furnishing of water to fight a fire, it would be liable to the owner of the property destroyed for the damage resulting from such negligence, *Concordia Fire Ins. Co. v. The Simmons Co.,* 168 *N. W.* 199 (*Wisc.* 1918), in which an adjoining landowner broke the water main leading to a fire hydrant; *Metallic Casting Co. v. Fitchburg R. R. Co.,* 109 *Mass.* 277 (1872), and *Phenix Ins. Co. of Brooklyn v. N. Y. Cent. and H. R. R. Co.,* 90 *N. E.* 1164 (*N. Y.* 1909), in both of which a railroad train ran over hose being used to fight a fire; and *Globe Malleable Iron Co. v. N. Y. Cent. and H. R. R. Co.,* 124 *N. E.* 109 (*N. Y.* 1919), and *Luedeke v. Chi. and N. W. R. R. Co.,* 231 *N. W.* 695 (*Neb.* 1930), in which the railroads were held liable in tort for obstructing a crossing thereby delaying the arrival of fire engines. There is no sound reason why a water company should be in a preferred position of immunity on the theory that it is merely the supplier of a commodity and therefore not liable in the absence of an express contract for a failure to supply water at a pressure sufficient for ordinary fire extinguishment purposes. If the plaintiff can prove the allegations of his complaint that the defendant knowingly reduced the water pressure to a point where it knew or had reason to know that it would not be sufficient to fight a fire, he should be permitted to recover because of the defendant's misfeasance or active wrongdoing. It is significant that the question of liability for misfeasance or active wrongdoing was not passed upon in any of the decisions relied upon by the majority.

## IV.

Two collateral questions remain. The first is whether a decision in favor of the plaintiff would result in the great confusion which the majority apparently fear. I cannot see that it would. The defendant is as capable of insuring itself against liability for its own negligence in the supplying of

water as the plaintiff and other property owners are of insuring themselves against loss by fire. Considering property alone, the question is merely on whom shall the burden of loss, or of insurance therefor, fall. Sound principles of justice would indicate that it be on the party at fault. If the rates currently fixed and presently being charged for water service by the defendant or other water companies are not sufficient to cover the cost of meeting or protecting themselves against such contingent liability, then procedures are available for adjusting the rates to the extent necessary. In determining liability for negligence the courts should not be governed by the adequacy of past or existing rates. But the problem has deeper implications than the mere loss of property and liability therefor. The failure to supply water for fire fighting purposes through the fire hydrants erected for that purpose may result in loss of life as well as of property. It is unthinkable that the defendant water company should be able to shield itself behind an outmoded rule of law at the expense of human life.

The other question is whether, assuming that the rule in *Baum v. Somerville Water Co.* needs to be changed, the courts should refuse to act and leave it to the Legislature to correct the injustice. In my dissenting opinion in the case of *Fox v. Snow*, 6 *N. J.* 12, 21 (1950), I had occasion to discuss this very question at some length and so I shall not here presume to traverse the same ground in detail again. Instead I will limit myself to citing a very recent decision of the New York Court of Appeals and a decision of the United States Supreme Court illustrating most clearly the process of the growth of the common law. The courts are under as great an obligation to revise an outmoded rule of the common law as the legislatures are to abolish or modernize an archaic statute. The common law is not merely a conglomeration of rules to be gleaned from decisions of the ancient past; it is a living and growing body of legal principles. It derives its life and growth from judicial decisions which alter an existing rule, or abandon an old rule and

substitute in its place a new one in order to meet new conditions. It is because of this gradual but continuous process of change that the body of our common law today is as different from that of mediaeval England as our physical surroundings are from those of that era. And it is absolutely essential that this be so, for it would be an impossible situation indeed if we attempted to determine 20th Century disputes by means of rules of law applicable to 15th Century facts.

This process was strikingly illustrated in a recent decision of the Court of Appeals of New York with reference to the right of a child to recover in tort for prenatal injuries, *Woods v. Lancet,* 102 *N. E.* 2d 691 (*N. Y.* 1951). In overthrowing the rule laid down some 30 years before in *Drobner v. Peters,* 133 *N. E.* 567 (*N. Y.* 1921), the court stated:

> "The precise question for us on this appeal is: shall we follow Drobner v. Peters, or shall we bring the common law of this State, on this question, into accord with justice? I think, as New York State's court of last resort, we should make the law conform to right." (102 *N. E.* 2d at *page* 692)
>
> "* * * Negligence law is common law, and the common law has been molded and changed and brought up-to-date in many another case. Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it, * * * * * * We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice.
>
> The same answer goes to the argument that the change we here propose should come from the Legislature, not the courts. Legislative action there could, of course, be, but we abdicate our own function, in a field, peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule." (102 *N. E.* 2d at *page* 694)

True it is that when a rule has been established by legislation, however undesirable it may be, it is for the Legislature alone to remedy the situation, see *Martin v. Curran,* 101 *N. E.* 2d 683, 686 (*N. Y.* 1951), decided less than two months prior to *Woods v. Lancet, supra.* But when the rule is one of common law established by the courts the remedy lies with either the Legislature or the courts, and inaction by one does not preclude action by the other.

Even so conservative a jurist as the late Mr. Justice Sutherland, in the case of *Funk v. United States,* 290 *U. S.* 371, 78 *L. Ed.* 369 (1933), refused to apply a long established rule rendering a wife incompetent to testify in her husband's behalf in a criminal proceeding, saying:

"The public policy of one generation may not, under changed conditions, be the public policy of another. * * *

It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion, it may have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present-day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past? * * * That this court and the other federal courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt * * *" (290 *U. S.* at *pages* 381, 382, 78 *L. Ed.* at *page* 375).

"To concede this capacity for growth and change in the common law by drawing 'its inspiration from every fountain of justice,' and at the same time to say that the courts of this country are forever bound to perpetuate such of its rules as, by every reasonable test, are found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a 'flexibility and capacity for growth and adaptation' which was 'the peculiar boast and excellence' of the system in the place of its origin.

* * * It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." (290 *U. S.* at *page* 383, 78 *L. Ed.* at *page* 376)

These principles, it seems to me, compel us to consider the rule of the *Baum* case as no longer adapted to either the legislation governing public utilities or the conditions of the present time. I would overrule it and instead hold that the defendant water company had a duty to furnish water in sufficient quantity and at sufficient pressure to extinguish ordinary fires, that duty arising (1) because of its peculiar

position as a public utility engaged in the business of supplying water under regulation by the State, and (2) because of the holding out of itself, by the maintenance of fire hydrants, as a supplier of water for fire fighting purposes and the reliance of the property owners it serves on that holding out. This duty I would consider breached either by nonfeasance, as charged in the plaintiff's first count, or by misfeasance, as charged in the plaintiff's second count. Accordingly, I would remand the case for trial so that the trier of the facts might determine whether the duty was in fact breached as alleged and whether the breach was a contributing factor to the plaintiff's loss.

HEHER, J. (dissenting). The pleaded liability for mere nonfeasance is not laid upon the defendant water company either by the common law, by statute or by contract. *Hall v. Passaic Water Co.*, 83 *N. J. L.* 771 (*E. & A.* 1912); *Baum v. Somerville Water Co.*, 84 *N. J. L.* 611 (*E. & A.* 1913). We cannot declare a duty unknown to the common law to accord with our conception of the requirements of justice. That is a legislative function.

The common law of England has a constitutional basis in our jurisprudence. The State Constitution of 1776 provided that "the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter." *Section XXII.* The Constitution of 1844 also ordained that "The common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature." *Article X, Section I.* And the Constitution of 1947 likewise provides that "All law, statutory and otherwise, all rules and regulations of administrative bodies and all rules of courts in force at the time this Constitution or any Article thereof takes effect shall remain

in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." *Article XI, Section I, paragraph* 3. A provision such as the last is deemed inclusive of the common law. *Ray v. Sweeney*, 14 *Bush.* (*Ky.*) 1 (*Ct. of App. Ky.* 1878); *Stout v. Keyes*, 2 *Dougl.* (*Mich.*) 184 (*Sup. Ct. Mich. 1st Cir.* 1845). In view of the constitutional history, there can be no doubt of that here.

While adaptable to modern social needs and the complexities of our present-day society, the fundamental principles of the common law are immutable except through the exercise of the legislative process. This by force of the constitutional mandate. A rule of liability unknown to the common law or the statute, and not arising by contract, may not come into being by judicial decree. It is axiomatic that the common law and the statutes have equal force, except as the former may be superseded by the latter or may run counter to the Constitution or the genius and spirit of our political institutions. Under the Constitution, the courts declare and effectuate the principles of the common law not superseded by statute or the Constitution itself. It is not the judicial province to effect a change of private rights under the common law by the substitution of a new rule of action or standard of liability. Compare *Watuppa Reservoir Co. v. City of Fall River*, 154 *Mass.* 305, 28 *N. E.* 257 (*Sup. Jud. Mass.* 1891). The Constitution invests the courts with the power of exposition alone. The modification of common law rules of liability comes within the legislative domain. *McQuigan v. Delaware, L. & W. R. Co.*, 129 *N. Y.* 50, 29 *N. E.* 235 (*Ct. App. N. Y.* 1891); *In re Hulett's Estate*, 66 *Minn.* 327, 69 *N. W.* 31 (*Sup. Ct. Minn.* 1896). It is the general rule that where the common law has been incorporated in the State's jurisprudence, its basic principles thereby adopted are subject only to constitutional restraints, the inherent limitations of the State's political institutions, and the exercise of the legislative power. *E. B. & A. C. Whiting Co., v. City of Burlington*, 106 *Vt.* 446, 175 *A.* 35

(*Sup. Ct. Vt.* 1934); *Brahmey v. Rollins,* 89 *N. H.* 290, 179 *A.* 186, 119 *A. L. R.* 8 (*Sup. Ct. N. H.* 1935); *Strout v. Burgess,* —— *Me.* —— 68 *A.* 2d 240, 12 *A. L. R.* 2d 939 (*Sup. Jud. Me.* 1949).

In England, the rule is· the same. In *Attorney General v. Todmorden Borough Council* (1937), 4 *A. E. R.* 588, Goddard, J., for the King's Bench Division said:

"Many people, however, may think that the time has come when it is desirable to reconsider this question of the immunity of the council, an immunity which exists at common law. Although the great virtue of the common law is that it can be moulded and developed by the judges so as to be fitted to the requirements, and to the changing requirements, of modern life, with respect either to commerce or to habits of life or to other social matters, yet, where a rule of law has become fixed by decision, it is not open to judges to-day to alter the law in this respect, which has always been the law from its development, and the remedies that are to be found in the legislation."

Stability and certainty are the first requisites of an ordered system of law defining the rights of persons and of property and the correlative obligations and duties; and I submit that changes in the common law are permissible only in the constitutional mode. Compare *Stockton v. Dundee Manufacturing Co.,* 22 *N. J. Eq.* 56 (*Ch.* 1871); *Swentusky v. Prudential Insurance Co. of America,* 116 *Conn.* 526, 165 *A.* 686 (*Sup. Ct. Err. Conn.* 1933). In Connecticut, the common law was not incorporated in the state's jurisprudence by the Constitution or statute. *State v. Muolo,* 118 *Conn.* 373, 172 *A.* 875 (*Sup. Ct. Err. Conn.* 1934).

But I hold the view that the second count of the complaint charges a positive act of negligent misfeasance at common law. I concur in the views of the Chief Justice in this regard. It is alleged that not long before the fire occurred, there was a knowing, intentional and wrongful reduction of the water pressure in such degree as to render water unavailable for fire-fighting purposes. This allegation would support proof of a reckless and wanton indifference to a reasonably forseeable risk of injury to plaintiff. There is

a well-defined distinction at common law between misfeasance and nonfeasance. *Milstrey v. Hackensack,* 6 *N. J.* 400 (1951). It is the generally accepted rule that if the act involves an unreasonable risk of harm to an interest of another which is protected against unintended invasion, it is negligent irrespective of whether, either in itself or in the manner in which it is done, it constitutes or results in a breach of a contractual or other duty which the actor owes either to the other or a third person. This is the difference, in respect of negligence, between an act and a failure to act. Where the alleged negligence of the actor consists in a failure to act for the protection or assistance of the other, his failure to do so is not negligence unless some relation between himself and the other or some antecedent action on his part has created a duty to act for the other's protection or assistance. The essential difference between the two situations is that in the first there is positive injury by the actor's action, while in the second he merely fails to receive the benefit which he would obtain had the actor taken the action necessary for his protection or assistance. *Restatement of Torts, section* 291 and *Scope Note* to *c.* 12, *Topic* 4, *p.* 797. Compare, *H. R. Moch Co. v. Rensselaer Water Co.,* 247 *N. Y.* 160, 159 *N. E.* 896 *(Ct. App. N. Y.* 1928).

Negligence is a matter of risk—that is to say, of recognizable danger of injury. In the early English common law, there was virtually no consideration of duty. One who injured another by a positive affirmative act was held liable without any great regard even for his fault. The courts were not concerned with mere omissions to act, even though another might suffer harm. From early times there was a distinction, still deeply rooted in the law of negligence, between "misfeasance" and "nonfeasance"—that is to say,

"between active misconduct working positive injury to others, and passive inaction, or a failure to take steps to protect them from harm. In theory, the difference between the two is obvious, but in practice it is not always easy to draw the line and to say whether conduct is active or passive. The reason for the distinction may be

said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs." *Prosser on Torts*, 175, 178, 190.

Liability for misfeasance is grounded in the reasonably foreseeable risk of harm to another from the action taken. It is the commission of a wrong remediable at common law.

I would reverse the judgment.

*For affirmance*—Justices CASE, OLIPHANT, WACHENFELD and BURLING—4.

*For reversal*—Chief Justice VANDERBILT, and Justice HEHER—2.