**Sarah MANOUKIAN and Gloria Tatigian Individually and as Executrices of the Estate of Kohar Tomasian, deceased, Appellants,**

v.

**John M. TOMASIAN, Appellee.**

**No. 12907.**

United States Court of Appeals District of Columbia Circuit.

Argued March 28, 1956.

Decided Sept. 20, 1956.

3. Cf. Continental Southern Lines v. Civil Aeronautics Board, 90 U.S.App.D.C. 352, 358, 197 F.2d 397, 403.

**212**

Mr. Charles O. Pratt, Washington, D. C., for appellants.

Mr. Rutherford Day, Washington, D. C., entered an appearance for appellee, for whom no brief was filed.

Before EDGERTON, Chief Judge, and BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

Plaintiff-appellee is one of the six children of Mrs. Kohar Tomasian, now deceased. Mrs. Tomasian's will, after provision for payment of debts and funeral expenses, devised and bequeathed a sum to a named charity, and the residue of her estate equally to her six children, who are also her sole heirs.[1] The only witnesses to the will were two of her daughters, appellants here. They were named executrices by the will and were examined in the probate proceedings. Appellee, after probate had been granted, brought this action to construe the will on the theory that under Sections 19–104 and 19–105 of the D.C.Code,[2] appellants were barred from taking under the will because they were its sole witnesses and had testified to establish it. The District Court grant-

---

[1] Provision was also made by testator, by a paragraph not relevant here, in case any of her children should fail to survive her.

[2] "§ 19–104. Devises to attesting witnesses void.

"If any person shall attest the execution of any will or codicil to whom any beneficial devise, legacy, estate, interest, gift, or appointment of or affecting any real or personal estate, other than and except charges on lands, tenements or hereditaments for payment of any debt or debts, shall be thereby given or made, such devise, legacy, estate, interest, gift, or appointment, shall, so far only as concerns such person attesting the execution of such will or codicil, or any person claiming under him, be utterly null and void; and such person shall be admitted as a witness to the execution of such will or codicil; notwithstanding such devise, legacy, estate, interest, gift or appointment mentioned in such will or codicil.

"§ 19–105. Attesting devisee not to retain nor demand any property under will or codicil.

"No person to whom any beneficial estate, interest, gift, or appointment shall be given or made, which is null and void under section 19–104, and who shall have been examined as a witness concerning the execution of such will or codicil, shall, after he shall have been so examined, demand or take possession of or receive any profits or benefit of or from any such estate, interest, gift, or appointment so given or made to him in or by any such will or codicil; or demand, receive, or accept from any person or persons whatsoever, any such legacy or bequest, or any satisfaction or compensation for the same, in any manner, or under any colour or pretence whatsoever."

In view of our disposition of the present case, we need not here consider whether the procedure adopted by the appellee was the proper one by which to raise questions as to the applicability or effect of the quoted sections. Cf. Fortune v. Buck, 1854, 23 Conn. 1, *8; Clark v. Clark's Estate, 1882, 54 Vt. 489.

ed summary judgment for appellee, relying on these statutory provisions.

Appellants urge that this result is most unjust, and defeats the intention of the testatrix to treat all her children equally. They note that no fraud or undue influence is alleged or even suggested, and urge that they witnessed the will in good faith, at testatrix' request. Appellee, they say, is relying on a technicality in order to disinherit two of his sisters and increase his own share in the estate.

Sections 19–104 and 19–105 of the D.C. Code are derived from the statute of 25 Geo. II, Ch. 6, §§ 1, 7, adopted by Parliament in 1752. Prior to that time, in order to destroy any incentive to a witness to perjure himself to establish a fraudulent will making a devise to him, the courts had refused to permit a witness who was a devisee under a will to testify to establish that will. The effect of this attitude of the courts was to prevent establishment of the will in its entirety. In order to preserve as much of the will as possible, while continuing to discourage efforts to establish fraudulent wills, Parliament passed the statute of 1752, which permitted the devisee-witness to testify, and which voided only the devise to him.

In most jurisdictions within the United States, there are legislative enactments specifically dealing with this problem in a manner essentially like the statute of 1752. See Bordwell, The Statute Law of Wills, 14 Iowa L.Rev. 1, 20, 22 (1928). In the vast majority of such jurisdictions, however, the legislature has concluded that it could soften the rigors of the old statute, without in any way undermining its efficaciousness, by permitting one who would take a share of the estate were it to pass by intestacy to take the devise in an amount no greater than his intestate share. See Bordwell, supra, at 24–25.[3] We think that in cases like the present one such a rule is sound.

The manifest object of the English statute of 1752 was to give maximum effect to wills witnessed by legatees and at the same time eliminate the opportunity for witness-legatees to benefit from fraudulent attestation. But in the instant case the witness-legatees would—because of the bequest to charity—receive a greater share of the estate by intestacy than under the will. Consequently were Section 19–104 to be literally applied, witness-legatees situated like these appellants would have an opportunity to benefit from fraudulent efforts—such as false denial of proper attestation—to defeat the probate of a will. Thus the "very evils to be remedied", Van Beeck v. Sabine Towing Co., 1937, 300 U.S. 342, 350–351, 57 S.Ct. 452, 456, 81 L.Ed. 685, would be resurrected. We cannot ascribe such an intent to the framers of the statute. The basic purpose of the statute—to uphold wills while eliminating possibilities of fraud—is in our view best carried out by holding that the witness-legatee who is also an heir at law can testify as to the execution of the will, and can take his devise under the will, but in an amount no greater than his intestate share. Cf. In re Trotter [1899], 1 Ch. 764; Gurney v. Gurney, 3 Drew 208, 61 Eng.Rep. 882 (1855).

We think such a holding is proper here, under established principles. "It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers. This has been often asserted, and the Reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator; for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, *or of the absurd results which follow from giv-*

---

**3.** See also Model Execution of Wills Act § 3, 9 U.L.A. 421. Some states appear to go further and permit any witness to take his devise up to the share he would have taken were the will not established (e.g., a non-heir mentioned in a prior will). See, e.g., Ky.Rev.Stat. § 394.210(2) (1953).

*ing such broad meaning to the words,* makes it unreasonable to believe that the legislator intended to include the particular act." Holy Trinity Church v. United States, 1892, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226. (Emphasis supplied.) Thus has the Supreme Court applied the "equity of the statute" doctrine [4] to exempt under appropriate circumstances a specific case from broad statutory language.

█ Furthermore, we must point out that Sections 19-104 and 19-105, unlike most portions of the District of Columbia Code, are not themselves acts of Congress passed for the government of the District. Instead, they are part of the law of the District because they are British statutes which were recognized as being in force in Maryland prior to the cession of the District in 1801, and which were maintained in effect by the Act of March 3, 1901, 31 Stat. 1189, D.C.Code 1951, § 49-301. The Code section just cited reads as follows:

"§ 49-301. Common law, principles of equity and admiralty, and Acts of Congress to remain in force.

"The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general Acts of Congress not locally inapplicable in the District of Columbia, and all Acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except in so far as the same are inconsistent with, or are replaced by, subsequent legislation of Congress."

█ The congressional reference to old British laws in the section just quot-

ed gives to those laws only "that force which they previously had in this tract of territory under the laws of Maryland." See Bank of Columbia v. Okely, 1819, 4 Wheat. 234, 242, 17 U.S. 234, 242, 4 L.Ed. 559. What was the force which the statute of 1752 "previously had"? It was received here during the colonial period not because of a voluntary reception by American courts—as was usually the case—but because the Act of Parliament in question by its terms applied to the colonies. Thus it seems clear that during the colonial period, the statute had the effect of a legislative enactment. From this it might be argued that this statute, in contrast to those voluntarily received here, should continue to have the force of legislative enactment. But after the Declaration of Independence British statutes were no longer the commands of an effective sovereign power in Maryland. Maryland decreed in 1776, in its original Declaration of Rights:

"That the inhabitants of Maryland are entitled to the common law of England, and the trial by jury according to the course of that law, and to the benefit of such of the English statutes as existed at the time of their first emigration, and which by experience, have been found applicable to their local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used, and practised by the courts of law or equity * * *." See D.C. Code 1951, Vol. 1, p. xx.

The Declaration of Rights drew no distinction between British statutes which were expressly made applicable to the colonies by Parliament, and those which were not. The statute of George II thus must be given the same force as—and no more than—any other British statute

<hr/>

4. The development of the doctrine from Aristotle, through Plowden, and into modern jurisprudence is well documented by Judge Frank in Usatorre v. The Victoria, 2 Cir., 1949, 172 F.2d 434, 439–443 & Notes 12–16. "Where the purposes of the statute can be achieved only by extending the operation of the language of the statute it will be extended, and where the purposes of the statute will be defeated by a literal interpretation of the statute the language will be restricted." 3 Sutherland, Statutory Construction § 6004 (3d ed. 1943).

received here by July 4, 1776.[5] That it was so received here by that date is, of course, not to be questioned. Elliot v. Brent, 1887, 6 Mackey 98, 102, 17 D.C. 98, 102.

■ British statutes antedating the Declaration of Independence have almost universally been regarded as having the effect of judicial precedent, rather than legislative enactment. "The common law of the mother country as modified by positive enactments, together with the statute laws which are in force at the time of the emigration of the colonists, becomes in fact the common law rather than the common and statute law of the colony. The statute law of the mother country, therefore, when introduced into the colony of New York, by common consent, because it was applicable to the colonists in their new situation, and not by legislative enactment, became a part of the common law of this province." Bogardus v. Trinity Church, N.Y.Ch. 1833, 4 Paige 178, 198, affirmed N.Y.Ct. of Errs.1835, 15 Wend. 111.[6] Such statutes are for many purposes considered part of our common law, Doe ex dem. Patterson v. Winn, 1831, 5 Pet. 233, 241–242, 30 U.S. 233, 241–242, 8 L.Ed. 108; cf. Gertman v. Burdick, 1941, 75 U.S. App.D.C. 48, 53, 123 F.2d 924, 929, certiorari denied sub nom. Burdick v. Burdick, 1942, 315 U.S. 824, 62 S.Ct. 917, 86 L.Ed. 1220, to be applied by American courts like the common law, rather than like enactments of our own legislatures. In substance, they have been received here as "part of our judicial heritage," cf. Gertman v. Burdick, supra, and should be interpreted and applied as such.

■■ The Supreme Court has clearly laid down the principles that govern our interpretation of the common law: "It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." Funk v. United States, 1933, 290 U.S. 371, 383, 54 S.Ct. 212, 216, 78 L.Ed. 369. The Supreme Court also cited with approval, Id., 290 U.S. at pages 383–384, 54 S.Ct. at page 216, the statement of the Indiana Supreme Court, Ketelsen v. Stilz, 1916, 184 Ind. 702, 707, 111 N.E. 423, 425, L.R.A.1918D, 303, that:

> " 'One of its [the common law's] oldest maxims was that where the reason of a rule ceased, the rule also ceased, and it logically followed that when it occurred to the courts that a particular rule had never been founded upon reason, and that no reason existed in support thereof, that rule likewise ceased, and perhaps another sprang up in its place which was based upon reason and justice as then conceived. No rule of the common law could survive the reason on which it was founded. It needed no statute to change it but abrogated itself.' "

And not only changed conditions but simply the peculiar circumstances of a particular case may justify departure from a rule of the common law to reach a sensible result. See Lutwak v. United States, 1944, 344 U.S. 604, 615, 73 S.Ct. 481, 97 L.Ed. 593. As the New York Court of Appeals has declared, "We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice." Woods v. Lancet, 1951, 303 N.Y. 349, 355, 102 N.E. 2d 691, 694, 27 A.L.R.2d 1250. See also Vanderbilt, C. J., dissenting in Reimann v. Monmouth Consolidated Water Co.,

5. That the coming of the Revolution represents a denial of mandatory effect even to those British statutes by their terms applicable to the colonies receives considerable support in Sioussat, The English Statutes in Maryland 66–68 (1903), at 21 Johns Hopkins Univ. Studies in Historical and Political Science (Nos. 11–12) 465, 530–32.

6. See also Sattig v. Small, 1862, 1 Kan.

170; Cresson's Appeal, 1858, 30 Pa. 437, 450; In re Kimberly's Estate, 1915, 249 Pa. 483, 487–488, 95 A. 86, 87–88; Gray, The Nature and Sources of the Law, 197; cf. People v. Den Uyl, 1948, 320 Mich. 477, 486, 31 N.W.2d 699, 703; Haggin v. International Trust Co., 1917, 69 Colo. 135, 138, 169 P. 138, 139, L.R.A.1918B, 710; Sioussat, supra, n. 4, at 42, 21 Johns Hopkins Univ. Studies at 506.

**216**

1952, 9 N.J. 134, 149–150, 87 A.2d 325, 332–334.[7]

Thus, whether we approach this case as one requiring construction of a statute or as one calling for application of common law principles, we think the result should be the same—a result based on reason and justice. We recognize that the old British statutes that have been received in the District of Columbia must be considered well established rules of law, not to be varied without good reason. Nor do we lightly undertake the task of excepting a particular case from the general rule of a statute—old or new. But here we think the course to be taken is plain: to exclude this case from the literal wording of Sections 19–104 and 19–105.

For these reasons, the judgment of the District Court will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

So ordered.

Appellant filed a brief, pro se, and his case was treated as submitted thereon.

Mr. E. Tillman Stirling, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll and Harold Titus, Jr., Asst. U. S. Attys., were on the brief, submitted on the brief for appellee. Messrs. Leo A. Rover, U. S. Atty., at the time record was filed, and John W. Kern, III, Asst. U. S. Atty., also entered appearances for appellee.

Before WILBUR K. MILLER, BAZELON and FAHY, Circuit Judges.

---

**7.** See also Stone, The Common Law in the United States, 50 Harv.L.Rev. 4, 8 (1936): "Blackstone, and as conservative a judge as Mr. Justice Parke, admitted. that the judge in the common-law system may rightly refuse to follow a precedent which is absurd, contrary to reason, or plainly inconvenient."