*For affirmance in part, reversal in part and remandment*
—Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—Justice HANDLER—1.

PAUL F. WEINBERG, AND MILTON GROSS, T/A TWIN BRIDGE APARTMENTS, PLAINTIFFS-APPELLANTS, v. DENNIS DINGER AND SHIRLEY DINGER, HIS WIFE, ASSOCIATED DEVELOPERS, MILTON SCHWARTZ AND ASSOCIATES AND SYMES ENGINEERING, DEFENDANTS, AND PENNS GROVE WATER COMPANY, DEFENDANT-RESPONDENT.

STEVEN A. COLE AND BETTY L. COLE, HIS WIFE, PLAINTIFFS-APPELLANTS, v. DENNIS AND SHIRLEY DINGER, HIS WIFE, TOWNSHIP OF CARNEYS POINT, JOHN DOE, A FICTITIOUS NAME FOR THE BUILDING INSPECTOR OF THE TOWNSHIP OF CARNEYS POINT, COLONIAL MORTGAGE COMPANY, T/A TWIN BRIDGE APARTMENTS, ASSOCIATED DEVELOPERS, BALA CYNWYD, P.A., AND MILTON SCHWARTZ, DEFENDANTS, AND PENNS GROVE WATER COMPANY, DEFENDANT-RESPONDENT.

Argued October 8, 1985—Reargued October 6, 1986.
Decided April 2, 1987.

*Susan M. Danielski* argued the cause for appellants Paul F. Weinberg, et al. (*Cozen and O'Connor,* attorneys; *Susan Danielski* and *Joshua Wall,* on the briefs).

*Mark L. Antin* and *Samuel A. Gennet* argued the cause for appellants Steven A. Cole, et al. (*Gennet and Kallmann,* attorneys).

*Joel A. Greenberg* argued the cause for respondent (*Horn, Kaplan, Goldberg, Gorny & Daniels,* attorneys; *Leonard C. Horn,* of counsel).

*Richard E. Shapiro,* Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae* Department of the Public Advocate (*Alfred A. Slocum,* Public Advocate, attorney; *Richard Shapiro, James Hirschhorn,* Special Assistant, Division of Rate Counsel and *Ida M. Castro,* Assistant Deputy Public Advocate, on the brief).

*William R. Holzapfel* argued the cause for *amicus curiae* National Association of Water Companies, New Jersey Chapter (*LeBoeuf, Lamb, Leiby & MacRae,* attorneys; *William R. Holzapfel,* and *Ruth A. Bosek,* on the briefs).

*Carla Vivian Bello,* Deputy Attorney General, argued the cause for *amicus curiae* Board of Public Utilities (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

STEIN, J.

In this appeal we reconsider the longstanding New Jersey rule immunizing private water companies from liability for their negligence in failing to provide to fire hydrants water pressure of sufficient force to extinguish a fire. We now hold that private water companies are no longer immune from such liability, except with respect to subrogation claims asserted by fire-insurance companies.

I

The facts are not in dispute. On November 23, 1980, a fire broke out at the Twin Bridge Apartments in Penns Grove, New Jersey. Because of inadequate water pressure at the nearby fire hydrants, fire fighters were unable to extinguish the flames. Consequently, the fire spread throughout the building, gutting the twelve-unit structure.

Weinberg, the owner of the property, and the Coles, residents in the building, brought suit against the Penns Grove Water Company (Penns Grove), a private water company that installed and maintained the fire hydrants and water mains in the municipality. Penns Grove operated under a filed tariff and pursuant to the rules and regulations of the Board of Public Utility Commissioners (BPUC). Plaintiffs alleged that Penns Grove negligently failed to inspect, maintain, and repair its water system, resulting in water pressure inadequate for fire fighting.

Penns Grove's 1976 tariff provided:

1. Pennsgrove Water Supply Company, Inc., * * * hereby adopts Regulations promulgated by the Board of Public Utility Commissioners * * *, insofar as they may be applicable to Water Utilities * * *.

> \*    \*    \*    \*    \*    \*    \*    \*

8. The Company will use due diligence at all times to provide continuous service of the character or quality proposed to be supplied but in case the service shall be interrupted or irregular or defective or fail, the Company shall be liable and obligated only to use reasonably diligent efforts in light of the circumstances then existing to restore or correct its characteristics.

> \*    \*    \*    \*    \*    \*    \*    \*

10. The standard terms and conditions contained in this tariff are a part of every contract for service entered into by the Company and govern all classes of service where applicable * * *.

Weinberg had signed a service contract with Penns Grove.[1] Like the tariff, this contract incorporated the rules and regulations of the BPUC. One of these regulations, *N.J.A.C.* 14:9–2.- 2, entitled "Pressure and volume of water service," provides as follows:

(a) Each water utility shall supply water service at adequate pressure and volume to the curb, or the point of connection with the customer's service line.

(b) Each water utility shall maintain sufficient pressure and volume of water at all fire hydrants to assure adequate streams for the fighting of fires.

The trial court granted summary judgment in favor of defendant Penns Grove, and the Appellate Division affirmed, 216 N.J.Super. 409, both ruling on the basis of our decision in *Reimann v. Monmouth Consol. Water Co.*, 9 *N.J.* 134 (1952). In *Reimann* we held that absent an express contractual or statutory provision, a private water company is not liable for negligently failing "to provide a sufficient supply of water at sufficient pressure to fire hydrants to extinguish a fire which is destroying an individual's property." *Id.* at 137–38 (citing *Baum v. Somerville Water Co.*, 84 *N.J.L.* 611 (E. & A. 1913)).

---

[1] The Coles, as residents in the building, had no specific agreement with Penns Grove.

## II

As we explained in *Reimann*, the duty of a water company to provide water sufficient to extinguish fires may stem from three distinct sources. It may be imposed by contract, by statute, or by common law. 9 *N.J.* at 137.

The contractual source of duty springs from ordinary principles of contract construction. In *Middlesex Water Co. v. Knappman Whiting Co.*, 64 *N.J.L.* 240 (1899), the Court of Errors and Appeals construed a contract between a business and a water company that explicitly provided for the supply of water to extinguish fires. The Court held that the water company's duty was unconditional:

> [W]here the contract is express, as it is in this case—to furnish water sufficient for fire purposes—to do a thing not unlawful, the contractor must perform it, and if, by some unforeseen accident, the performance is prevented, he must pay damages for not doing it. [*Id.* at 251.]

However, in *Hall v. Passaic Water Co.*, 83 *N.J.L.* 771 (1912), the Court of Errors and Appeals denied recovery to a mill for its fire loss, finding no express agreement between the mill and water company as to the provision of water for fire-fighting purposes. The court found the contract to be between the *city* and the water company, and thus found no cause of action on behalf of the mill. *Id.* at 774, 776 (citing *Middlesex Water Co. v. Knappman Whiting Co., supra*, 64 *N.J.L.* 240).

In denying recovery absent an express contractual provision, the Court in *Baum v. Somerville Water Co., supra*, 84 *N.J.L.* 611, also made the first authoritative pronouncement of common-law tort immunity for New Jersey water companies. The plaintiff in *Baum* sued a water company with which he had no contractual relation. He argued that "a duty was owed to the public to supply sufficient water of sufficient pressure to extinguish fires." *Id.* at 613. The court held:

> [I]n the absence of contract no liability exists on the part of the defendant for the benefit of the plaintiff. The common law does not impose such a liability and we have not been pointed to any statute which creates it. In the absence of contract it does not exist. [*Id.* at 615.]

In *Atlas Finishing Co. v. Hackensack Water Co.*, 10 *N.J. Misc.* 1197 (Sup.Ct.1932), a manufacturer sued a water company for breach of its contractual, common-law, and statutory duties to provide water to extinguish fires. The court there denied relief on any of the three asserted grounds. As to the contract claim, it found that there existed at most an implied contract for ordinary water service, but that this was insufficient to ground a claim for failure to provide water sufficient to put out fires. The *Atlas* court asserted that "[t]he primary business of a water company, so far as private customers are concerned, is to furnish water as a commodity * * *. [I]t was never contemplated that from the simple relation of distributor and customer, the former undertook to assume liability for failure to furnish water to extinguish fires." *Id.* at 1199–1200. "Such liability," the court continued, "can only arise out of an express contract. It does not arise by implication." *Id.* at 1201.

Expanding on its conclusion that the primary business of water companies is to supply water as a commodity, and not to extinguish fires, the *Atlas* court rejected plaintiff's claim based on common-law negligence:

> It may very well be that the object of connecting the plaintiff's pipe lines with the defendant's water system was for the purpose of enabling the plaintiff to obtain a supply of water to combat fires on its premises, but as we have seen, the obligation of the defendant would merely be to supply water as a commodity, in the absence of an express contractual obligation to furnish it for fire extinguishing purposes. [*Id.* at 1202.]

Finally, the court rejected the claimed existence of a statutory duty based on the Public Utility Act. The Act provided: "[N]or shall any public utility as herein defined provide or maintain any service that is unsafe, improper or inadequate." *Id.* at 1203. The court held that this statute gave no private right of action to aggrieved individuals. *Id.*

We reconsidered the issue of a water company's common-law duty to supply water pressure of adequate force to fight fires in *Reimann, supra,* 9 *N.J.* at 134. There, plaintiff owned a recreation area that was destroyed by a fire when defendant failed to provide sufficient water pressure to the nearby hy-

drants. Summarizing prior New Jersey law on the subject, the Court said:

> Before there can be either nonfeasance or misfeasance there must be a duty * * *. There was no contract, therefore no duty imposed by contract. There is no applicable statute and therefore no statutory duty. Plaintiff argues for a common law duty, but the Court of Errors and Appeals held in *Baum v. Somerville Water Company*, 84 *N.J.L.* 611 (1913) * * * that the common law does not impose a duty upon a company serving a municipality with water to provide a sufficient supply of water at sufficient pressure at fire hydrants to extinguish a fire which is destroying an individual's property. [*Id.* at 137–38.]

To the suggestion that the Court reject the *Baum* rule denying a common-law duty, the Court expressed its reluctance to overturn such a well-settled rule of law, deferring that task to the Legislature.

The Court also evaluated the policy arguments most often cited by authorities and courts in other jurisdictions favoring the immunity. Two general concerns were cited. First, the *Reimann* Court observed that the imposition of an actionable duty of care on the part of water companies would create an inefficient form of compulsory fire insurance. The Court recognized that imposing liability on water companies for fire damage resulting from their negligent failure to provide adequate water pressure would increase the cost of providing water. This additional cost would ultimately have to be passed on to the water consumer, forcing the consumer, in effect, to insure against fire loss through increased water rates. This is inefficient, the Court suggested, because water rates are not variable according to risk of fire, whereas ordinary fire-insurance premiums are.

Second, echoing the concerns of the Court in *Baum*, the *Reimann* Court expressed its fear that abrogating tort immunity for water companies would open the door to potentially limitless liability. The Court noted that such liability could theoretically overwhelm smaller water companies, causing bankruptcies and adding uncertainty to the supply of water. *Id.* at 139–40.

The decision in *Reimann* to reaffirm *Baum* was 4–2. Chief Justice Vanderbilt dissented, pointing out that the controversy in *Baum* had arisen at a time when water companies were unregulated and

> the rates charged and the service rendered by water companies were solely matters of contract between the water company and the property owners in the area it served. They were free to contract without regulation by the State. In those circumstances the property owner could expect to receive by way of water service only that for which he had contracted to pay.
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> Today a property owner stands in the same relation to a water company as a traveller does to a bus company; he accepts the service that is offered and pays the price that is fixed by the Board of Public Utility Commissioners. Such a situation is inherent in the very nature of a public utility which enjoys a public monopoly and is subect to public regulation.
>
> In these circumstances differing radically from those in which the earlier cases were decided, can it reasonably be said that the rule of law which was applicable formerly is still binding on us today? Must not consideration be given to the change in the status of water companies under the Public Utility Acts of 1910 and 1911 and the changed relationship between water companies and property owners resulting therefrom? To fail to do so would not speak well for the nature of the common law which requires that each time a rule of law is applied it be scrutinized carefully to make sure that conditions have not so changed as to make its further application the instrument of injustice. The regulation of public utilities by the State has superseded the "freedom of contract" so-called that was the major premises of the *Baum* case and the earlier decisions. In the circumstances of the present case I am convinced that since the decision was rendered in *Baum v. Somerville Water Co., supra,* the statutory law of this State as to water companies has so changed as to make the rule there laid down no longer acceptable. [*Id.* at 143–45.]

He also rejected the majority's conclusions about inefficient insurance coverage:

> The defendant is as capable of insuring itself against liability for its own negligence in the supplying of water as the plaintiff and other property owners are of insuring themselves against loss by fire. Considering property alone, the question is merely on whom shall the burden of loss, or of insurance therefor, fall. Sound principles of justice would indicate that it be on the party at fault. [*Id.* at 148–49.]

Finally, the Chief Justice disputed the necessity for deference to the Legislature:

> The courts are under as great an obligation to revise an outmoded rule of the common law as the legislatures are to abolish or modernize an archaic statute. The common law is not merely a conglomeration of rules to be gleaned from

decisions of the ancient past; it is a living and growing body of legal principles. It derives its life and growth from judicial decisions which alter an existing rule, or abandon an old rule and substitute in its place a new one in order to meet new conditions.

    \*    \*    \*    \*    \*    \*    \*    \*

True it is that when a rule has been established by legislation, however undesirable it may be, it is for the Legislature alone to remedy the situation. But when the rule is one of common law established by the courts the remedy lies with either the Legislature or the courts, and inaction by one does not preclude action by the other. [*Id.* at 149–50 (citations omitted).]

The *Reimann* rule has been reconsidered by this Court three times. In *Sydney Grossman Hotel Corp. v. Lakewood Water Co.*, 27 *N.J.* 91 (1958), a divided Court (Justices Heher, Jacobs and Francis dissenting), upheld *Reimann*, stating, "The question is a close one, but an existing rule of law should not be overturned unless its injustice is clear. We are not satisfied that *Reimann* is wrong in its overall application." *Id.* at 92. In *Brooks v. City of Orange*, 61 *N.J.* 576 (1972), and *J.H.M. Realty Corp. v. Town of Belleville*, 61 *N.J.* 577 (1972), we also declined to depart from the *Reimann* rule.

### III

In re-evaluating the arguments for denying recovery to a plaintiff whose property was destroyed by fire due to a water company's negligence, it is helpful to consider the resolution of this issue by other jurisdictions. The rule in the majority of states is that of *Reimann:* absent an explicit contractual or statutory basis, a water company has no duty to provide water in sufficient quantity to extinguish fires.[2]

Most cases denying recovery to water consumers consider both contractual- and tort-liability theories. The most frequent contractual claim, absent from the case before us, rests upon an agreement between the municipality and the water company for water to be supplied to fire hydrants. The majority of courts

---

[2]For a compilation of the earliest of these cases, see 78 *Am.Jur.*2d § 51 at 938 n. 71 (1975).

faced with this claim deny that the individual consumer is granted any rights under a contract to which he is neither a party nor an explicitly "intended" beneficiary. *E.g., German Alliance Ins. Co. v. Home Water Supply Co.,* 226 *U.S.* 220, 33 *S.Ct.* 32, 57 *L.Ed.* 195 (1912); *Earl E. Roher Trans. & Storage Co. v. Hutchinson Water Co.,* 182 *Kan.* 546, 322 *P.*2d 810 (1958); *Gatewood v. City of Detroit,* 121 *Mich.App.* 57, 329 *N.W.*2d 34 (1982); *Clark v. Meigs Equip. Co.,* 10 *Ohio App.*2d 157, 226 *N.E.*2d 791 (1967); *accord Luis v. Orcutt Town Water Co.,* 204 *Cal.App.*2d 433, 22 *Cal.Rptr.* 389 (1962). In the leading case of *H.R. Moch Co., Inc. v. Rensselaer Water Co.,* 247 *N.Y.* 160, 159 *N.E.* 896 (1928), Chief Judge Cardozo said:

> In a broad sense it is true that every city contract, not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit * * * must be one that is not merely incidental and secondary. It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost. [*Id.* at 164, 159 *N.E.* at 897 (citations omitted).] [3]

When a direct contract for water service exists between consumer and water company, the majority-rule jurisdictions generally construe it strictly and deny liability unless the contract expressly provides that the water company furnish water to fire hydrants servicing the customer's property. *Stuart v. Crestview Mut. Water Co.,* 34 *Cal.App.*3d 802, 808–09, 110 *Cal.Rptr.* 543, 547 (1973); *Libbey v. Hampton Water Works*

---

[3]The opinion in *Moch* was written by Cardozo after his landmark opinion in *MacPherson v. Buick Motors Co.,* 217 *N.Y.* 382, 111 *N.E.* 1050 (1916), and the significantly more restrictive approach of the *Moch* opinion has been noted by several commentators. *See, e.g.,* Note, "Torts—Liability of Water Company for Negligent Maintenance of Fire Hydrants," 18 *Rutgers L.Rev.* 172, 173 (1964). Professor Seavey has criticized *Moch* as Cardozo's "most unsatisfactory decision in the field of torts," Seavey, "Reliance Upon Gratuitous Promises," 64 *Harv.L.Rev.* 913, 920–21 (1951), and as a case in which Cardozo failed to pursue "his accustomed method of facing realities." Seavey, "Mr. Justice Cardozo and the Law of Torts," 52 *Harv.L.Rev.* 372, 392, 48 *Yale L.J.* 390, 410, 39 *Colum.L.Rev.* 20, 40 (1939).

*Co., Inc.*, 118 *N.H.* 500, 389 *A.*2d 434 (1978); *Rose v. Sapulpa Rural Water Co.*, 631 *P.*2d 752, 756 (Okla.1981).

Similarly, when a statute allegedly establishes a duty on the part of a water company to provide water adequate for fire fighting, majority-rule jurisdictions require the statute to create an explicit cause of action on behalf of the individual property owner. *See, e.g., Cole v. Arizona Edison Co., Inc.*, 53 *Ariz.* 141, 86 *P.*2d 946 (1939), modified, *Veach v. City of Phoenix*, 102 *Ariz.* 195, 427 *P.*2d 335 (1967); *H.R. Moch v. Rensselaer Water Co., supra*, 247 *N.Y.* 160, 159 *N.E.* 896, 899 (1928).

After exploring contractual and statutory grounds for water-company liability, courts invariably face the assertion of a common-law duty on the part of the water company to exercise reasonable care in providing water for fighting fires. Although the "majority rule" encompasses a reluctance to construe contracts or statutes to provide a cause of action on behalf of a property owner against water companies for fire damage caused by insufficient water pressure, the linchpin of the majority rule is the denial of a cause of action in tort. *German Alliance Ins. Co. v. Home Water Supply Co., supra*, 226 *U.S.* 220, 33 *S.Ct.* 32, 57 *L.Ed.* 195; *Stuart v. Crestview Mut. Water Co., supra*, 34 *Cal.App.*3d 802, 110 *Cal.Rptr.* 543; *Libbey v. Hampton Water Works Co., Inc., supra*, 118 *N.H.* 500, 389 *A.* 2d 434; *H.R. Moch Co., Inc. v. Rensselaer Water Co., supra*, 247 *N.Y.* 160, 159 *N.E.* 896; *Rose v. Sapulpa Royal Water Co., supra*, 631 *P.*2d 752; W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts*, § 93 at 671 (5th ed. 1984); 78 *Am.Jur.*2d § 53.

The reasoning in these cases is frequently conclusory. Some courts insist that the only *possible* source of a duty of care is contractual. In the *German Alliance* case, *supra*, 226 *U.S.* 220, 33 *S.Ct.* 32, 57 *L.Ed.* 195, the Court said, "Neither can [the taxpayer] sue in tort, because, in the absence of a contract obligation to him, the water company owes him no duty for the breach of which he can maintain an action *ex delicto*." *Id.* at

229, 33 *S.Ct.* at 34, 57 *L.Ed.* at 199. Other cases rest on the distinction between misfeasance and nonfeasance, concluding that a water company that does not expressly undertake to supply water to fire hydrants has no duty to persons who incur loss because of inadequate water pressure. *Prosser and Keeton on the Law of Torts, supra* § 93, at 671.

In *Libbey v. Hampton Water Works Co., Inc., supra,* 118 *N.H.* 500, 389 *A.*2d 434, the New Hampshire court addressed directly the policy reasons leading to the rejection of a duty on the part of water companies, recognizing that "[t]he question whether there is a 'duty' merely begs the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Id.* at 502, 389 *A.*2d at 435 (quoting W. Prosser, *Handbook of the Law of Torts* § 53, at 325 (4th ed. 1971)). The *Libbey* court balanced the foreseeability of the potential injury to a water consumer's home against the unlimited potential liability of water companies and the consequent risk of interrupted water service, and declined to impose liability. *Id.; accord Stuart v. Crestview Mut. Water Co., supra,* 34 *Cal.App.*3d 802, 110 *Cal.Rptr.* 543; *H.R. Moch Co. v. Rensselaer Water Co., supra,* 247 *N.Y.* 160, 159 *N.E.* 896. Indeed, whether explicitly or implicitly, the majority of cases denying water company liability ultimately turn on the fear of exposing water companies to unbounded liability. *See* Note, "Torts—Liability of Water Company to Individuals for Failure to Furnish Water," 26 *Temple L.Q.* 214, 216 (1953).

Finally, an important historical factor in the denial of water company liability is the analogy of water provision to a governmental service, with its concommitant sovereign tort immunity. *See, e.g., German Alliance Ins. Co. v. Home Water Supply Co., supra,* 226 *U.S.* at 227–30, 33 *S.Ct.* at 34–35, 57 *L.Ed.* at 198–99. That the modern erosion of sovereign tort immunity undermines this argument has also been recognized. *See Stuart v. Crestview Mut. Water Co., supra,* 34 *Cal.App.*3d at 806, 110 *Cal.Rptr.* at 546.

Eight states recognize a cause of action against suppliers of water for failing to supply sufficient water for fire fighting, without requiring an express contractual or statutory basis for such a claim. *Harris v. Board of Water and Sewer Comm'rs of Mobile,* 294 *Ala.* 606, 320 *So.*2d 624 (1975) (liability based either on tort or third party beneficiary status of plaintiff); *Veach v. City of Phoenix, supra,* 102 *Ariz.* 195, 427 *P.*2d 335 (1967) (municipality that assumes responsibility to supply water for fire protection liable in tort for negligent performance of duty); *Woodbury v. Tampa Water Works Co.,* 57 *Fla.* 243, 49 *So.* 556 (1909) (recognizes cause of action in tort against water company; complaint dismissed for insufficient allegations as to causation); *Pineville Water Co. v. Bradshaw,* 266 *S.W.*2d 305 (Ky.1953) (recognizes cause of action by consumer as third party beneficiary of contract between water company and city); *Potter v. Carolina Water Co.,* 253 *N.C.* 112, 116 *S.E.*2d 374 (1960) (recognizes cause of action by consumer as third party beneficiary of contract between water company and city); *Doyle v. South Pittsburgh Water Co.,* 414 *Pa.* 199, 199 *A.*2d 875 (1964) (recognizes cause of action in tort against water company); *White v. Tennessee-American Water Co.,* 603 *S.W.* 2d 140 (Tenn.1980) (water company's liability in tort based on failure to comply with regulation mandating "adequate and safe service"); *Shannon v. City of Grand Coulee,* 7 *Wash. App.* 919, 503 *P.*2d 760 (1972) (recognizes city's liability to consumer based on negligence).

A leading case imposing a common-law duty of care upon water companies is *Doyle v. South Pittsburgh Water Co., supra,* 414 *Pa.* 199, 199 *A.*2d 875. In *Doyle,* the water company had contracted with the municipality to provide water to fire hydrants. The plaintiffs' home burned down when none of the five nearby hydrants supplied sufficient water pressure to enable the fire department to extinguish the fire.

The court in *Doyle* reasoned that it was foreseeable that a defectively-maintained fire hydrant "could result in the very loss which occurred in the very manner it occurred." *Id.* at

205, 199 *A*.2d at 877. Although the municipality might have had no duty to install fire hydrants in the first place, once it did install them, the question became whether the water company had the duty to exercise "reasonable care in the maintenance and repair of the planted hydrants." *Id.* at 207, 199 *A*.2d at 878. The court concluded that the water company did have such a duty, expanding upon the rule of *MacPherson v. Buick Motors Co,* 217 *N.Y.* 382, 111 *N.E.* 1050 (1916):

> The physical situation in the case at bar and the facts evolving therefrom bring this litigation squarely within the [*MacPherson* ] rule that where a party to a contract assumes a duty to the other party to the contract, and it is foreseeable that a breach of that duty will cause injury to some third person not a party to the contract, the contracting party owes a duty to all those falling within the foreseeable orbit of risk of harm. [*Doyle, supra,* 414 *Pa.* at 207, 199 *A*.2d at 878.]

The *Doyle* majority opinion discusses counter-arguments rooted in the availability of fire insurance to individual homeowners, and the danger of limitless litigation and potentially huge damage awards. To the argument that homeowners can insure, the court stated: "A tortfeasor has no right to immunity from liability for his wrongdoing simply because his victim may, by an outlay of money, obtain some measure of relief from the injury done to him by the tortfeasor." *Id.* at 215, 199 *A*.2d at 882. The dangers of limitless litigation are exaggerated, the court contended, and the fear of water company insolvency misplaced. "Responsibility in law does not depend on the thermometer of the tortfeasor's exchequer. * * * Equality under the law does not mean parity of bankbooks between the evildoer and his victim." *Id.* at 216, 199 *A*.2d at 833.

## IV

The agreement between Weinberg and Penns Grove incorporates by reference the regulatory requirement that the water company "maintain sufficient pressure and volume of water at all fire hydrants to assure adequate streams for the fighting of fires," *N.J.A.C.* 14:9–2.2. Although the agreement and the regulation it adopts could serve as an independent basis for the

water company's liability, we choose to rely primarily on settled principles of tort law as the basis for our decision.

A cause of action founded upon negligence involves a breach of a duty of care that causes injury. *See Fortugno Realty Co. v. Schiavone-Bonomo Corp.*, 39 *N.J.* 382, 393 (1963); *Brody v. Albert Lifson & Sons*, 17 *N.J.* 383, 389 (1955); *Stanley Co. of America v. Hercules Powder Co.*, 16 *N.J.* 295, 315 (1954); *see also Prosser and Keeton on the Law of Torts*, *supra* § 30, at 164–65 (negligence cause of action has four elements: (1) duty of care, (2) breach of duty, (3) proximate cause, and (4) actual damages). The critical issue before us is whether Penns Grove's alleged failure adequately to install and maintain a system of water delivery to fire hydrants could be found to breach a duty of care owed by the water company to those who depend on it to protect their homes from fire.

The standard of care ordinarily imposed by negligence law is well established. To act non-negligently is to take reasonable precautions to prevent the occurrence of foreseeable harm to others. What precautions are "reasonable" depends upon the risk of harm involved and the practicability of preventing it. *See People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 267 (1985); *cf. Wytupeck v. Camden*, 25 *N.J.* 450, 461 (1957) (law of negligence requires reasonable conduct in light of apparent risk); *Harpell v. Public Serv. Coordinated Transp.*, 20 *N.J.* 309, 316 (1956) (care demanded by standard of reasonable conduct must be in proportion to apparent risk). We ordinarily evaluate a defendant's conduct on the basis of what a "prudent man" would have done in defendant's circumstances. *See Trentacost v. Brussel*, 82 *N.J.* 214, 222 (1980); *Sanzari v. Rosenfeld*, 34 *N.J.* 128, 134 (1961); *Rappaport v. Nichols*, 31 *N.J.* 188, 201 (1959).

The reasonableness of action in relation to foreseeable risks is an essentially objective determination to be made on the basis of the material facts. It is not, however, enough to ground liability in negligence to show that a defendant did not act with

reasonable care, and that this carelessness caused injury. Plaintiff must also show that defendant owes him a duty of care. As we said in *Kelly v. Gwinnell,* 96 *N.J.* 538 (1984):

> In most cases the justice of imposing such a duty is so clear that the cause of action in negligence is assumed to exist simply on the basis of the actor's creation of an unreasonable risk of foreseeable harm resulting in injury. In fact, however, more is needed, "more" being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care. [*Id.* at 544 (citing *Palsgraf v. Long Island R.R. Co.,* 248 *N.Y.* 339, 162 *N.E.* 99 (1928)).]

Whereas the magnitude and likelihood of potential harm are objectively determinable, the propriety of imposing a duty of care is not. This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that, "[w]hether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Kelly v. Gwinnell, supra,* 96 *N.J.* at 544 (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962)); *see also Rappaport v. Nichols, supra,* 31 *N.J.* at 205 ("policy considerations and the balancing of conflicting interests are the truly vital factors in the molding and application of the common law principles of negligence"); *Wytupeck v. Camden, supra,* 25 *N.J.* at 462 ("[D]uty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows * * *.").

The determination that private water companies owe no duty of care to those who depend on them for water to extinguish fires is a judicially-created tort immunity. A number of antiquated common-law tort immunities have been rejected or significantly narrowed by this Court since the *Reimann* decision in 1952 immunizing private water companies. *See Foldi v. Jeffries,* 93 *N.J.* 533 (1983) (parental immunity); *Merenoff v. Merenoff,* 76 *N.J.* 535 (1978) (interspousal immunity); *Willis v. Department of Conservation & Economic Dev.,* 55 *N.J.* 534 (1970) (sovereign immunity); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N.J.* 29 (1958) (charitable immunity).

In limiting parent-child immunity in *Foldi v. Jeffries, supra,* we said, "we start from the fundamental principle that liability ordinarily should be imposed upon those who wrongfully injure others." 93 *N.J.* at 544. As we observed in *Merenoff v. Merenoff, supra:*

[I]n the tort field, immunities, which furnish absolution from liability * * * stand as conflicting exceptions to the general principle that there should be reparation for wrongful injury. Consistent with this conception of justice and fairness, many immunities in the evolution of the law have withered or perished as legal relics, not fit for survival in contemporary times. [76 *N.J.* at 547 (citations omitted).]

That a structure could be destroyed by fire because of a negligently-maintained water-delivery system is self-evident. Whether reasonable care could have prevented the destruction of the Twin Bridge apartment building is a question for the finder of fact. The question before us is whether considerations of fairness and policy militate so strongly against requiring private water companies to compensate the victims of their carelessness as to justify maintaining their common-law tort immunity.

On behalf of the water company, the following arguments are made: Imposing upon private water companies a duty to act with reasonable care would not benefit the public, because homeowners would in any case need adequate fire insurance; abrogating water company immunity would only encourage redundant insurance coverage on the part of the water companies; liability insurance for water companies, if available at all, would be expensive due to the extreme risk, and this cost will be passed on to water consumers. This form of compulsory insurance through water rates, it is argued, is inefficient because water rates do not vary with fire hazard. If sufficient insurance is not obtained, large negligence judgments could force water companies into bankruptcy, thereby interrupting water service.

In addressing these arguments, we must keep in mind the central goals of the law of torts. As we said in *People Express, supra,* 100 *N.J.* at 255, the primary purpose of the tort

law is "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." Moreover, forcing tort-feasors to pay for the harm they have wrought provides a proper incentive for reasonable conduct. A rule that denies water consumers a right of recovery for water-company negligence diminishes the incentive for water companies to perform maintenance that would prevent large fire losses. *See* Morris, "Enterprise Liability and the Actuarial Process—the Insignificance of Foresight," 70 *Yale L.J.* 554, 595 (1961). Since the applicable standard of liability is negligence, and not liability without fault, a water company that exercises due care will not be liable in tort. By acting non-negligently, water companies will decrease the risk of fire damage and loss of life in ways property owners cannot, and, at the same time, minimize their own exposure to tort liability.

It is contended that since property owners are invariably insured against loss from fire damage, a rule imposing liability on water companies would simply create a windfall for property-insurance carriers whose subrogation rights would permit them to recoup from water companies sums paid out pursuant to property insurance policies. In this connection, we note that the risks of loss accommodated by property insurance are narrower than those that a water company's exposure to liability would encompass. As Chief Justice Vanderbilt observed in his dissenting opinion in *Reimann:*

> But the problem has deeper implications than the mere loss of property and liability therefor. The failure to supply water for fire fighting purposes through the fire hydrants erected for that purpose may result in loss of life as well as of property. It is unthinkable that the defendant water company should be able to shield itself behind an outmoded rule of law at the expense of human life. [9 *N.J.* at 149.]

We are mindful of the concern that the water company's added liability insurance cost, ultimately borne by the consumer, constitutes a less efficient method of insuring against fire loss than is afforded by property insurance. We are also acutely aware that the shrinkage of the casualty insurance

market and the sharp escalation in casualty insurance premiums that has recently occurred will affect the availability and cost of liability insurance for water companies. *See N.J.A.C.* 11:1–20, –20.1, and –22 (emergency regulations, adopted by Commissioner of Insurance on September 17, 1985, and readopted November 16, 1985, that prohibit insurance carriers from cancelling or refusing to renew certain property- and casualty-insurance policies without prior approval by Commissioner of Insurance), and Commissioner's Statement of Imminent Peril dated September 16, 1985.[4]

Our recognition of insurance-related concerns on the part of water companies prompted us to request reargument of this appeal and to solicit the participation of the Attorney General, on behalf of the Board of Public Utility Commissioners and the Public Advocate. We specifically requested the parties to address "the relevance of the effect on the availability of liability insurance and the rates that the water companies charge their consumers in the event the immunity at issue for private water companies is eliminated."

The briefs and supplemental affidavits submitted on reargument demonstrate that the rate escalation prevalent in the insurance industry has already caused water companies in New Jersey and elsewhere to experience a sharp increase in premiums and a reduction in coverage, independent of any impact our decision in this matter may have. Some insurance carriers have discontinued writing "failure to serve" liability coverage for water companies and others continue to offer it, generally at higher rates and with less protection. In states that impose liability on water companies that fail to supply adequate pres-

---

[4]On June 16, 1986, the Commissioner of Insurance repealed *N.J.A.C.* 11:1–20 and adopted new rules *N.J.A.C.* 11:1–20 and –22. 18 *N.J.R.* 1388–94. *N.J.A.C.* 11:1–20.3(a) now includes as a ground for cancellation of a commercial insurance policy:

> 8. Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract; * * *. [18 *N.J.R.* 1393.]

sure for fire fighting, the claims experience has been insubstantial and water companies have used insurance, self-insurance, and reserve funds to meet their obligations to claimants.

Neither Penns Grove, *amicus* National Association of Water Companies, New Jersey Chapter, nor the BPUC disclaims the responsibility of water companies to provide adequate water pressure at hydrants. Indeed, the BPUC, while strongly opposing abolition of water company immunity, argues that it has sufficient statutory and regulatory power to require water companies to provide adequate pressure at hydrants and to fine and, if necessary, disenfranchise companies that fail to comply.

Ultimately, the strongest argument against liability is that it is unnecessary because most property owners are already insured against fire loss. Accordingly, since fire insurance policies are authorized by statute to include a subrogation clause assigning to the insurer the insured's claims against a responsible third party, *N.J.S.A.* 17:36–5.20, the water companies contend that the abrogation of immunity would benefit not the property-owners but the insurance carriers. Although this argument minimizes the interests of claimants who are underinsured or who sustain personal injuries, there is little question that the existence of first-party insurance and the prospect of windfall recoveries by carriers exercising subrogation rights is the most.persuasive argument against the abrogation of water company immunity.

However, elimination of the water companies' immunity does not necessarily require that we impose on them liability for the subrogation claims of fire insurance carriers. Subrogation is an equitable doctrine. It seeks "to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it." *Standard Accident Ins. Co. v. Pellecchia,* 15 *N.J.* 162, 171 (1954) (citations omitted); *accord George M. Brewster & Son, Inc. v. Catalytic Constr. Co.,* 17 *N.J.* 20, 28 (1954). Although highly favored in the law, "it is not an absolute right but rather is applied under equitable standards

with due regard to the legal and equitable rights of others * * *."
*Standard Accident Ins. Co. v. Pellecchia, supra*, 15 *N.J.* at
171–72. As we observed in *A. & B. Auto Stores of Jones St. v.
City of Newark*, 59 *N.J.* 5 (1971):

> When, as here, an insurance carrier which has satisfied a loss it was paid to
> cover, seeks to recoup by asserting a claim its insured has against another with
> respect to that loss, the final question must be whether justice would be
> furthered by that course. [*Id.* at 23.]

In *A. & B. Auto Stores, supra*, 59 *N.J.* at 20–28, we upheld
the trial court's determination that the City of Newark was
liable for damages arising out of widespread disorders in July,
1967, pursuant to the riot statute, *N.J.S.A.* 2A:48–1 to –7, but
reversed the trial court's decision imposing liability on the City
for subrogation claims brought by insurance carriers. We
noted that the legislature had amended the statute to bar such
subrogation claims, *L.*1968, c. 386, § 1 (1969) (codified as
amended at *N.J.S.A.* 2A:48–1), but that the effective date of the
amendatory act was subsequent to the institution of suit.
Hence, the issue was whether the statute, as it existed prior to
the 1968 amendment, required Newark to pay subrogation
claims of insurance carriers that had covered losses sustained
during the riots. Concluding that the riot statute imposed liabil-
ity "without regard to whether a municipality [was] without
fault," *id.* at 24, we observed that the rationale for the statute is
that "the community, rather than the individual victim, should
absorb losses of such origin. The community is thus an involun-
tary surety." *Id.* After balancing the interests of the City and
the insurance carriers, we concluded that the subrogation claims
should not be enforced:

> The city is not a wrongdoer. On the contrary, as we have already shown, it is
> chargeable as an involuntary surety for the actual wrongdoers, with a stated
> statutory right to be indemnified by them. Thus, we repeat, the contest is
> between a paid insurer and an unpaid one. We do not believe that the paid
> insurer was the intended beneficiary of this statutory liability. The remote
> likelihood that subrogation would further a legislative purpose to induce local
> vigilance is not enough to justify subrogation against a community made a
> statutory surety without regard to fault. [*Id.* at 27–28.]

In *A. & B. Auto Stores, supra,* we relied on the reasoning of the Supreme Court of Wisconsin in *Interstate Fire & Casualty Co. v. City of Milwaukee,* 45 *Wis.*2d 331, 173 *N.W.*2d 187 (1970), and of the Kentucky Court of Appeals in *William Burford & Co. v. Glasgow Water Co.,* 223 *Ky.* 54, 2 *S.W.*2d 1027 (1928). The Wisconsin case involved a riot statute analogous to the New Jersey statute we construed in the Newark riot case, and the issue there concerned the liability of the City of Milwaukee for subrogation claims filed by insurance carriers that had covered riot losses. Rejecting the subrogation claims, the Wisconsin Supreme Court noted:

> Clearly, if the respondents were allowed to recover from the city, they would in a sense be recouping their losses from their insureds. This is because any loss by a city must of necessity be passed on to its residents in the form of increased taxes.
>
> The insureds, as residents of the city, would thus pay not only premiums, but also a portion of their own loss. In paying the losses the respondents merely discharged their own obligation and not an obligation for which the city was primarily liable as a tort-feasor.
>
>    *      *      *      *      *      *      *      *
>
> In the instant case application of the doctrine would cause a similar result. While insurance companies, after receiving their premium, would continually be assured of recovery, the members of the community, who had not caused nor participated in riots, would be forced to bear the risk for which insurance companies had received premiums. [45 *Wis.*2d at 338–39, 173 *N.W.*2d at 191–92.]

In the Kentucky case, the issue involved the liability of a municipal water company for subrogation claims brought by a number of fire-insurance carriers. They contended that the water company had failed to maintain adequate water pressure for fire-fighting purposes and that, as a result, large quantities of tobacco and other property belonging to their insured was destroyed by fire. In upholding the trial court's dismissal of the complaint, the Kentucky Court of Appeals stated:

> The water company is entitled to live and to make a fair return on the investment. To meet the increased liability, higher water rates will be necessary. The added burden will fall on the consumers. The result will be that the citizens and property owners will not only pay for fire protection premiums sufficient to cover the risk assumed, but will also pay higher water rates for the purpose of relieving the insurance companies of the liability which they have

been paid to assume. In our opinion this will operate oppressively on the people, and will run counter to a sound public policy. We therefore conclude that, in the circumstances presented, the doctrine of subrogation should not be applied in favor of the insurance companies. [223 *Ky.* at 57, 2 *S.W.*2d at 1029.]

We also note that the legislature has expressly barred subrogation claims in suits against public entities and employees pursuant to the New Jersey Tort Claims Act, *N.J.S.A.* 59:9-2. The Comment to this section indicates that the prohibition against subrogation claims "reflects a recognition that profit-making insurance companies are in a better position to withstand losses which they contract for than are the already economically burdened public entities." Comment, *N.J.S.A.* 59:9-2. The fact that water companies are utilities whose operating costs are predominantly paid by the consuming public suggests that the rationale for barring subrogation claims against public entities may be applicable when a fire insurance carrier asserts a subrogation claim against a water company.

We believe that the imposition on a water company of liability for subrogation claims of carriers who pay fire losses caused by the company's negligent failure to maintain adequate water pressure would inevitably result in higher water rates paid by the class of consumers that paid for the fire insurance. The result of imposing subrogation-claim liability on water companies in such cases would be to shift the risk from the fire-insurance company to the water company, and, ultimately, to the consumer in the form of increased water rates. Thus, the consumer would pay twice—first for property insurance premiums, and then in the form of higher water rates to fund the cost of the water company's liability insurance. We find this result contrary to public policy.

■ Accordingly, we abrogate the water company's immunity for losses caused by the negligent failure to maintain adequate water pressure for fire fighting only to the extent of claims that are uninsured or underinsured. To the extent that such claims are insured and thereby assigned to the insurance carrier as required by statute, *N.J.S.A.* 17:36-5.20, we hold that

the carrier's subrogation claims are unenforceable against the water company.[5]  This determination is made without prejudice to the right of a subrogation claimant, either in this or other litigation, to offer proof tending to demonstrate that any increase in water rates resulting from liability for subrogation claims would be substantially offset by reductions in fire-insurance premiums.  If insurance rates were set on the basis of risk and experience, one would expect a high correlation between the increase in water company liability rates and the decrease in fire-insurance rates occasioned by the abrogation of water company immunity in cases like this.  If that correlation were to be proven in subsequent litigation, we would be prepared to reconsider our denial of the carrier's right to subrogation against a water company.

It is argued that a rule imposing liability on water companies for negligently failing to provide adequate water pressure to fire hydrants would expose water companies to extraordinary losses at great cost to the public that ultimately pays the water rates established by law.[6]  The fear of limitless liability and litigation has marked many advances in tort law.  *See People Express Airlines, Inc. v. Consolidated Rail Corp., supra,* 100 *N.J.* at 253–54;  *H. Rosenblum, Inc. v. Adler,* 93 *N.J.* 324, 348

---

[5]Read literally, the statute authorizes but does not compel the insurance carrier to obtain an assignment of the insured's claim to the extent of payment by the insurer.  We assume that all fire-insurance policies require such an assignment.  Obviously, the intent of our holding is not only to bar the carrier's subrogation claim, but also to prevent a double-recovery by an insured who receives payment from a carrier but does not assign to the carrier the insured's claim against a third party responsible for the loss.

[6]Our holding today is limited to the category of negligent conduct alleged in the complaint, such as "failing to adequately, properly and safely inspect, maintain and repair said water system" and "failing to replace outmoded and inadequate fire hydrants, fire mains, water lines and other appurtenant equipment."  We do not decide the issue of a water company's liability for fire losses caused by inadequate water pressure at hydrants where the cause of the inadequate pressure is a drought of unpredictable severity, or an alleged design deficiency in the water company's storage capacity or transmission system.

(1983). As we said in *People Express,* "[t]he answer to the allegation of unchecked liability is not the judicial obstruction of a fairly grounded claim for redress. Rather, it must be a more sedulous application of traditional concepts of duty and proximate causation to the facts of each case." 100 *N.J.* at 254. Reasonable care is not a standard beyond the reach of any enterprise.

Water companies enjoy an unusual economic status. *In re Petition of South Lakewood Water Co.,* 61 *N.J.* 230, 238–39 (1972). Their customers, unable to choose among purveyors of water, are entitled to rely on the company designated to serve them for an adequate supply of water. A water company that undertakes to supply water within a designated and protected market can fairly be charged with a duty to all its customers to use reasonable care to assure that its delivery system is in working order to fulfill its capabilities to furnish an adequate supply of water for all purposes, including fire fighting.

Both doctrinal and policy considerations argue strongly for the imposition on private water companies of a duty to exercise reasonable care in the provision of water for fire fighting. Although only a minority of states have pursued this course, it is the overwhelming recommendation of the scholarship on the subject.[7] Against these forces stands the immunity doctrine of

---

[7] *See, e.g.,* W. Prosser, *Handbook of the Law of Torts, supra* § 93 at 625–26 (Professor Keeton expresses less conviction in the fifth edition; *see Prosser and Keeton on the Law of Torts, supra* § 93, at 671); Corbin, "Liability of Water Companies for Losses by Fire", 19 *Yale L.J.* 425 (1910); Seavey, "Mr. Justice Cardozo and the Law of Torts," 52 *Harv.L.Rev.* 372, 393, 48 *Yale L.J.* 390, 409, 39 *Colum.L.Rev.* 20, 41 (1939); Seavey, "Reliance upon Gratuitous Promises or Other Conduct," 64 *Harv.L.Rev.* 913, 920–21 (1951); Seavey, "The Waterworks Cases and *Stare Decisis,*" 66 *Harv.L.Rev.* 84 (1952); Sunderland, "The Liability of Water Companies for Fire Losses," 3 *Mich.L.Rev.* 442 (1905); Note, "Water Company Liability for Defective Fire Hydrants," 65 *Colum.L.Rev.* 169 (1965); Note, "Liability of Water Company to Individuals for Failure to Furnish Water," 26 *Temple L.Q.* 214 (1953); *cf.* Note, "Liability of Water Company for Negligent Maintenance of Fire Hydrants," 19 *Rutgers L.Rev.* 172, 179–80 (1964) (minority rule "utilizes sound tort doctrine in overcoming a seemingly glaring inconsisten-

*Reimann,* itself rooted largely in its deference to *stare decisis* as reflected by the 1913 decision in *Baum v. Somerville Water Co., supra,* 84 *N.J.L.* 611. *See Reimann v. Monmouth Water Co., supra,* 9 *N.J.* at 139–40. In *Reimann,* the Court concluded that "if our law is to be overturned, the result should be effected by the Legislature, vested with the law-making power." *Id.* at 140. Now, thirty-five years later, we decline to continue to follow this course. The immunity of private water companies from liability for negligently failing to maintain adequate water pressure for fire extinguishing is an anomaly in New Jersey tort law, but it is an anomaly of our own creation. We must take responsibility for its elimination. We expressed similar sentiments in our abolition of the charitable immunity doctrine:

> The primary function of the law is justice and when a principle of the law no longer serves justice it should be discarded; here the law * * * runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others; it operates harshly and disregards modern concepts of justice and fair dealing; it has been roundly and soundly condemned here and elsewhere and the time has come for its elimination by the very branch of government which brought it into our system. [*Collopy v. Newark Eye and Ear Infirmary, supra,* 27 *N.J.* at 47–48.]

Accordingly, we impose on private water companies the duty to act with reasonable care in providing water for extinguishing fires, and overrule *Reimann v. Monmouth Consolidated Water Co.* and cases decided in reliance on it. As stated, we presently decline to enforce insurance carrier subrogation claims against private water carriers, reserving for this or other litigation the issue whether recognition of subrogation claims can be justified by the prospect of a reduction in fire-insurance rates commensurate with the increase in liability-insurance costs for water companies.

---

cy in a relatively narrow area of tort law," but legislative solution preferred). *Contra* Kales, "Liability of Water Companies for Fire Losses," 3 *Mich.L.Rev.* 501 (1905).

■   The Appellate Division grudgingly affirmed the trial court's decision granting the water company's motion for summary judgment on the authority of *Reimann,* claiming that *Reimann*'s immunity doctrine stood "like a dinosaur from the past." 216 *N.J.Super.* 409, 413 (1984). We agree with this observation by the Appellate Division and, hence, reverse its judgment and remand the matter to the Law Division for trial on the merits.[8] In view of the significant change in the law represented by our holding, the effect and application of our decision, except as to these cases, shall be prospective only. *Merenoff v. Merenoff, supra,* 76 *N.J.* at 560.

HANDLER, J., concurring in part and dissenting in part.

I agree with the majority's decision to abrogate part of water companies' immunity in suits claiming that the companies negligently failed to provide sufficient water pressure to extinguish a fire. However, I disagree with the majority's decision to retain the water companies' immunity in cases involving subrogation claims.

Immunities are generally judge-made doctrines created long ago, when very different social circumstances and legal doctrines justified their existence. "In the tort field, immunities, which furnish 'absolution from liability', stand as conflicting exceptions to the general principle that there should be reparation for wrongful injury. Consistent with this conception of justice and fairness many immunities in the evolution of the law have withered or perished as legal relics not fit for survival in

---

[8]Although we were informed at oral argument that these cases involve subrogation claims, the record does not disclose whether plaintiffs were fully compensated for their losses. Accordingly, the trial court on remand should determine, consistent with our holding, whether or not the named plaintiffs can maintain a cause of action against the water company. To the extent that plaintiffs' claims are identified as subrogation claims by fire-insurance carriers, such claims should be dismissed unless the claimants are prepared to prove that increases in water company insurance costs because of liability for such subrogation claims would be substantially offset by decreases in fire-insurance premiums. *Supra* at 492.

contemporary times." *Merenoff v. Merenoff,* 76 *N.J.* 535, 547 (1978) (citation omitted). This Court has removed most of the ancient tort immunities. *See Foldi v. Jeffries,* 93 *N.J.* 533 (1983) (parental immunity); *Merenoff v. Merenoff, supra* (interspousal immunity); *Willis v. Dept. of Conservation & Economic Dev.,* 55 *N.J.* 534 (1970) (sovereign immunity); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N.J.* 29 (1958) (charitable immunity).

The judicial role in cases such as this one is to cleanse the tort system of its irrational and anomalous elements. The result should be principled, consistent rules, applied uniformly. Here, liability for negligence should apply broadly, even if the defendant is a water company, and even if the plaintiff is an insurance company.

While I do not think the courts should be indifferent to the social consequences of liability rules, they should humbly view their ability to gather and evaluate relevant evidence. The judicial role is at its strongest in making sure that rules are applied consistently and rationally. The judicial role is far less strong in predicting those few occasions when strong social interests would be harmed by the consistent application of liability rules.

In the present case, I do not think that the Court has before it sufficient information to predict dire consequences if the water companies' immunity is fully lifted. Its decision is constructive and sound in its holding that the legal and social policies no longer justify immunizing water companies from their negligence in supplying water for firefighting purposes. However, the Court takes a quantum leap back by limiting the abrogation of immunity to uninsured or underinsured victims.

The principle against immunity from tort liability should, for the moment, stand. The legislature is the proper forum for determining whether societal interests require a reimposition, in whole or in part, of the water companies' immunity, and if there is to be partial or limited immunity, whether that should be

achieved directly, or indirectly by modifying the insurance laws. There is no reason to believe that the legislature will not act if such action is warranted. *E.g. N.J.S.A.* 59:1-1 to 59:12-3 (the Tort Claims Act, which reimposed in part the State's sovereign immunity); *N.J.S.A.* 2A:53A-7 (which reimposed in part the charitable immunity).

GARIBALDI, J., dissenting.

Ultimately, the issue in this appeal is whether the long-standing rule granting common-law tort immunity to private water companies or its abrogation, with or without subrogation, will best serve the citizens of the state. The answer to this question will have a significant impact on the delivery of water to a large segment of the public and on the rates it will pay for this essential commodity. The Board of Public Utilities (BPU), the agency that the Legislature has authorized to regulate the industry, has advised this Court that the abrogation of immunity is against public policy because it jeopardizes the continued viability of many water suppliers and will increase water rates to one-third of the state's water consumers.[1]

Both the majority and I agree with the BPU that simple abrogation of water company immunity is contrary to public policy primarily because "the consumer would pay twice—first for property insurance premiums, and then in the form of higher water rates to fund the cost of the water company's liability insurance." *Ante* 492. By precluding fire insurance companies from asserting subrogated claims, the majority believes it can avoid the adverse economic impact warned of by the BPU. There is, however, no evidence to support that assumption.

[1] Amicus *Curiae,* National Association of Water Companies, New Jersey Chapter, a trade association of investor-owned water companies providing water services within New Jersey, states that its members provide water service to approximately one-third of the population of New Jersey.

The sweeping policy change effected by the majority's no immunity/no subrogation scheme—a change that affects a basic service to so many consumers—should be made by the Legislature based on information and forecasts supplied by the BPU and the Commissioner of Insurance. It should not be based on judicial speculation. Most certainly this Court should not decree such a change in contravention of the express position of the governmental agency charged with regulating the industry. Therefore, I must dissent.

I

In *Reimann v. Monmouth Consolidated Water Co.,* 9 *N.J.* 134 (1952), we stated that the major policy question of whether to alter the long-standing rule of immunity for water companies was more properly addressed to the Legislature than the Court. *See id.* at 139.[2] Despite *Reimann*'s direct invitation to the Legislature to abolish the tort immunity of private water companies, thirty-five years have passed and it has not done so. During this period, the Legislature has not been unaware of these companies. In 1983, for example, it amended the Safe Drinking Water Act, *N.J.S.A.* 58:12A–1 to –11, to require periodic testing of public water supplies. And in 1981, it passed the Facilities and Services of Small Water Companies Act (commonly referred to as the Small Water Company Takeover Act), *N.J.S.A.* 58:11–59 to –63, under which a small water company may be acquired by a public or private entity when the company is unable to comply with certain operating standards. In the face of these enactments regarding water companies, the Legislature's continued acquiescence in the *Reimann* rule indicates that the rule remains consistent with legislative intent. *See Lemke v. Bailey,* 41 *N.J.* 295, 301 (1963) ("The construction of a

---

[2]We affirmed *Reimann* in *Sydney Grossman Hotel Corp. v. Lakewood Water Co.,* 27 *N.J.* 91 (1958); *Brooks v. City of Orange,* 61 *N.J.* 576 (1972); and *J.H.M. Realty Corp. v. Town of Belleville,* 61 *N.J.* 577 (1972).

statute by the courts, supported by long acquiescence on the part of the Legislature, or by continued use of the same language or failure to amend the statute, is evidence that such construction is in accordance with the legislative intent.").

More importantly, insofar as the Legislature has acted in this area, it has given broad statutory authority to the BPU to regulate water companies. *See N.J.S.A.* 48:2–13. The BPU has authority to order utilities to provide safe, adequate service, *N.J.S.A.* 48:2–23. Water companies supply an essential commodity and, therefore, are extensively regulated by the BPU. Indeed, a BPU regulation specifically provides that "[e]ach water utility shall maintain sufficient pressure and volume of water at all fire hydrants to assure adequate streams for the fighting of fires." *N.J.A.C.* 14:9–2.2(b).

Because the BPU not only is authorized to regulate water companies, but also is the agency that will approve the increased rates that will be charged to consumers as a result of the companies' new tort liability, we invited it to take a post-argument position on the *Reimann* rule. We expressly requested it to address the impact that the abrogation of immunity would have on water rates and the availability of liability insurance for the companies. In response to our inquiry, the BPU strongly urged the continuation of the *Reimann* immunity rule, stating:

[U]nlike the time-worn doctrines of spousal and familial immunity cited by appellants as illustrative of a judicial trend away from immunity, the reasons justifying the immunity traditionally granted water companies for fire losses continue valid to this day.[3] One need only recall the recent conflagration in Passaic, one of New Jersey's largest industrial cities, to illustrate the potential

---

[3]The BPU correctly points out that spousal and parental immunity were based on outdated societal assumptions, *see Merenoff v. Merenoff,* 76 *N.J.* 535 (1978) (abolishing interspousal tort immunity); *Foldi v. Jeffries,* 93 *N.J.* 533 (1983) (explaining the extremely limited scope of modern intrafamily tort immunity), while water company immunity is based on practical and current economic reality.

scope of loss resulting from an uncontrollable fire.[4] What if insufficient water pressure had contributed to the losses in Passaic, and what if, as a matter of law, the water supplier could be held liable for the extent of such losses. "(T)he ensuing litigation would doubtless be great," as predicted by the *Reimann* court, and the "degree of confusion that would follow so revolutionary a decision" unimaginable. [9 *N.J.*] at 139–140. Could any water company survive such financial exposure? Would any insurer be willing to take on such a risk? Would the inner city resident be compelled to pay substantially higher rates for water service than would his suburban counterpart because of a higher risk of fire? Adding to the confusion would be the need to define the scope of liability. For example, would compensable losses be limited by type, dollar amount or customer category? There are no certain answers to these questions, but some fair assumptions can be drawn from the Board's prior experience with water utility insurance issues.

In concluding that the immunity of private water companies continues to serve the public interest, the BPU reaffirmed the position it took in *Button Leasing Co. v. Hackensack Water Co.*, No. 684–160, aff'd, No. A–1794–69 (App.Div.1970). In that case, the Appellate Division affirmed the BPU's determination that it would be against the public interest to hold a water company liable for damage due to the company's failure to furnish sufficient water at adequate pressure for fire-fighting purposes. The Button Leasing Company had sought to force the Hackensack Water Company to eliminate from its fire-service contracts a clause exculpating it from liability for gross or willful negligence in failing to furnish sufficient water pressure for fire-fighting purposes. The prohibitive cost of insurance to cover such liability convinced the BPU not to impose it.[5] The BPU determined that elimination of the exculpatory provision from the companies' private fire protection contracts would have "a substantial adverse economic effect on the water

---

[4]At oral argument, the BPU explained that claims arising out of the Labor Day 1985 fire in Passaic exceeded $500 million.

[5]The Hearing Officer in his Report found that the total annual operating cost to the water company relating to fire protection insurance would have been $125,000. If this amount were then distributed among the water company's private fire protection customers, they would have experienced an increase of $93 over the then existing average service charge of $585, an increase of approximately 16%.

company and its customers," and would confer no real benefit upon property owners who would most likely retain their private fire insurance policies.

The BPU's opposition to the tort liability endorsed by the majority is even stronger today than it was in *Button*. Its recent survey of the insurability of water companies has convinced the BPU that "judicial imposition of yet another level of liability could easily precipitate an insurance crisis in the water industry." [6] We have every reason to respect that assessment. *See generally* [Insurance] Commissioner's Statement of Imminent Peril dated September 16, 1985; *see also N.J.A.C.* 11:1–20, –20.1 and –22 (emergency regulations adopted by the Commissioner of Insurance on September 17, 1985, and re-adopted November 16, 1985, that restrict the rights of insurance carriers to cancel or refuse to renew property and casualty insurance policies; *N.J.A.C.* 11:1–20.3(a)(8) (effective August 21, 1986) (allowing commercial insurors to cancel policies as a

---

[6] In its brief the BPU cautions that the *Button Leasing* figures are 1970 estimates and that the insurance in question would have covered only those customers who specifically contracted for fire protection service. Moreover, the utility involved in *Button Leasing* was (and remains) one of the state's largest water utilities with a large customer base over which to distribute increased costs, while most of New Jersey's privately owned water companies are much smaller utilities with smaller customer bases.

Fifty-six of eighty-two water companies responded to the BPU's recent survey of the insurability of water companies for risks for which there is no immunity. The twelve largest water companies (Class A companies having annual operating revenues of $500,000 or more) pay a total of $3,800,000 in liability insurance premiums annually. These companies have been unable to procure pollution coverage and have experienced cancellations and nonrenewals of various policies. The Hackensack Water Company, which was involved in the 1969 *Button Leasing* case, reported an annual liability premium of $848,000 in 1986. In 1987 its premiums are expected to increase by $636,000. In 1985 the premium was $475,000. The company also reports an increase in the deductible of its General Liability policy. Smaller water companies report paying approximately $365,000 in liability insurance premiums. The BPU reveals that the majority of these companies have not yet experienced the difficulties faced by the larger water companies with regard to the exposure they faced before today.

result of new statutory or case law which materially increases exposure).

We have consistently held that the Legislature intended to delegate the widest range of regulatory power over public utilities to the BPU. *See Boss v. Rockland*, 95 *N.J.* 33 (1983); *Township of Deptford v. Woodbury Township Sewerage Corp.*, 54 *N.J.* 418, 424 (1969). In so doing, we have recognized the BPU's expertise in balancing the interests of the public against the interests of the utilities. In *Boss*, we held that the lower court should have referred the issue of what was "necessary for the proper operation and maintenance" of an electric company to the BPU for resolution, rather than deciding the issue itself. *See* 95 *N.J.* at 39. We further warned that "[c]ourts should be sensitive to purported legal claims that are really regulatory issues and should be referred to the agency." *Id.* at 42. We should be guided by that sensitivity today, and should heed the BPU's recommendation.

## II

The majority decision not only conflicts with the Legislature's policies toward the immunity and regulation of private water companies, it also obstructs the legislative design for subrogation rights.

*N.J.S.A.* 17:36–5.20 specifically addresses the issue of subrogation rights for fire insurance companies:

Every fire insurance policy shall contain certain standard provisions which shall be in the words and in the order hereinafter set forth:

\* \* \* \* \* \* \* \*

Subrogation. This Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company.

"Where the terms of the particular policy are pr[e]scribed by statute, the statute will also govern the right to subrogation...." 16 *Couch on Insurance* § 61:6 at 82 (2d ed. 1983). Nevertheless, without any hearing on this issue, the Court on its own motion holds that an insurance carrier's subrogation

claims, specifically provided for by *N.J.S.A.* 17:36–5.20, are unenforceable against the water company. The majority's cavalier disregard for contractual clauses entered into under the authority of *N.J.S.A.* 17:36–5.20 is unsupportable. The majority relies on *A. & B. Auto Stores of Jones Street, Inc. v. City of Newark*, 59 *N.J.* 5 (1971), but our decision to deny insurance companies the right to bring subrogation claims in that case did not contravene any legislative provision, as the majority decision today does. As it applied in that case, the Riot Act Statute was silent on the issue of subrogation rights. *See id.* at 22–23. After that case was initiated, but before it was decided, the Legislature amended that statute so that it specifically denied subrogation rights. Although the amendment was not applicable to the claims at bar, it did provide this Court with "a fresh legislative redetermination of the underlying policy question." *Id.* at 19.

In *A. & B. Auto Stores*, we relied on the proposition, as had the courts in *Interstate Fire & Casualty Co. v. City of Milwaukee*, 45 *Wis.*2d 331, 173 *N.W.*2d 187 (1970), and *William Burford & Co. v. Glascow Water Co.*, 223 *Ky.* 54, 2 *S.W.*2d 1027 (1928), that a court may block subrogation in the interests of justice when the party that the insurance company hopes to collect from is *not* culpable of tortious behavior.[7] Because the linchpin of today's majority decision creates tort liability for culpable water companies, the cited decisions do not provide precedent for the majority's decision. Here, the Court is shifting the risk of loss away from the wrongdoer (the water company) and placing it on the fire insurance companies, who are not at fault.

---

[7] In *Interstate*, the City of Milwaukee was liable under a statute that, like the one in *A. & B. Auto Stores*, made it a surety for riot damage without regard to fault. *See* 45 *Wis.*2d at 337, 173 *N.W.*2d at 191. In *Burford*, the water company "was not guilty of a tort. Its liability [to the property owners was] predicated solely on the breach of its contract [with the city] to furnish sufficient facilities to extinguish the fire." 223 *Ky.* at 57, 2 *S.W.*2d at 1028.

At the very least, the important policy of precluding subrogation claims should be decided on an appropriate record. This is not a subrogation case. Neither the parties nor BPU nor the National Association of Water Companies briefed or argued subrogation. *See generally Busch v. Home Insurance Co.*, 97 *N.J.Super.* 54, 57 (App.Div.1967) ("[T]he question of whether a provision for subrogation should not be permitted in a policy because impractical or unfair is for the Commissioner of Banking and Insurance to decide.") No insurance companies appeared before the court. Indeed, only Amicus Department of Public Advocate in its brief raised the issue of subrogation and it concluded that

> [t]here are sound reasons for not addressing this complex question at the present time. The record does not yet indicate whether either party has first party insurance or whether the water company is negligent. The views of the first party insurers and the liability carriers for water companies are not before the court on this issue. The economic burden of tort liability is not as well known as it will be after the Board of Public Utilities has decided on a specific ratemaking treatment of liability costs.

There are no forecasts by the BPU or the Commissioner of Insurance of the impact of the no immunity/no subrogation proposal established by today's decision. Neither I nor, I respectfully submit, the majority knows how subrogation will affect either water rates or fire insurance premiums for consumers, or the availability and cost of liability insurance for the water companies. In a perfect world, perhaps, the aggregate premium reduction for fire insurance would equal the aggregate increase of water rates. However, this result seems highly unlikely, especially because the water companies and property owners will not all use the same carriers.

## III

Most importantly, I do not agree with the majority that its subrogation doctrine will be effective in reducing the plight of the water consumer. The policy reasons advanced by the BPU to continue the immunity are equally applicable to continuing the immunity even with the preclusion of subrogation claims.

With or without subrogation, water companies will need new liability insurance policies to cover claims by underinsured [8] or uninsured property owners. It is simply unreasonable in this time of reduced insurance availability and escalated premiums to assume that this insurance will not be costly, particularly in light of the fact that water companies have no way of knowing which properties within the zone of danger—residential or commercial, within or without their service areas—are fully insured for fire loss; which are insured only for the structure and not the contents; and which are underinsured for the structure and/or the contents.

As the majority acknowledges, most of the people who will be injured by the water company's negligence already have fire insurance protection and will continue to insure their property adequately against the risk of fire damage regardless of today's decision. For these people, the abolition of immunity is unnecessary. Recovery for these owners under their fire insurance policy is a more reliable compensation mechanism than litigation seeking recovery for negligence. In short, for these insured property owners—and for tenants who have comprehensive property protection insurance—the only likely result is higher water rates. For these consumers, abandoning the immunity rule is not only inefficient, it is also unfair. Fire insurance premiums take into account the value of the insured property as well as the risk the property presents—the greater the value and/or risk, the higher the premium. In contrast, water companies charge uniform rates for equivalent water service. If fire insurance premiums are in this sense analogous to a progressive tax, water rates are like a regressive tax. An owner of a home worth $100,000 pays the same uniform water rate as the owner of commercial property worth $1,000,000.

---

[8] Obviously, many property owners will consider themselves to have been underinsured after they settle with their fire insurance companies. Thus, water companies will be forced to endure significant additional litigation as a result of today's holding.

Yet, the water company's exposure to risk of loss for damage due to its negligence to the $1,000,000 property, and its insurance premiums for such a risk, are much greater than for its exposure to damage to the homeowner. I believe it is fairer to allocate the risk of protecting the more valuable property to those who own the property.

Moreover, water companies serving older, more crowded neighborhoods where the fire risk is greater than in newer, more affluent communities will likely have to pay substantial premiums to secure liability insurance, if such insurance is even available. These higher premiums will result in higher water rates for consumers in these areas, who in many cases will be unable to afford an increase.

In sum, the new rules benefit few. Granted there are some uninsured or underinsured persons whose property will be damaged and some persons who will be personally injured as the result of negligence of the water company that will receive reimbursement they presently are not entitled to receive. Nevertheless, to compensate these few, I believe that the vast majority of water consumers will pay higher utility rates.

## IV

In conclusion, the balancing of the conflicting interests of the persons injured by the water company's negligence and the water consumers should be done by the Legislature. I submit that the Legislature, by enacting its regulatory scheme, has concluded that the BPU's regulation of water companies better serves the public interest than would the imposition of this new tort liability. The BPU has the expertise to determine if fire hydrants are being properly maintained and the authority to levy fines and other sanctions against companies that fail to provide adequate service, without disrupting the level of service

to the public or imposing burdensome consequences on the consumers. *N.J.S.A.* 48:2–51.[9]

The speculative nature of the majority decision illustrates how correct this Court was in *Reimann* to characterize the abolition of tort immunity for water companies as a legislative rather than judicial question. Further study of the issue may provide economic forecasts and empirical evidence that establishes that the majority's no immunity/no subrogation policy will not have an adverse impact on one-third of the water consumers in New Jersey. However, we have no evidence of this. Accordingly, I would not abolish the immunity.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For affirmance*—Justice GARIBALDI—1.

---

[9]Failure of a utility to perform acts required by the BPU is a misdemeanor under *N.J.S.A.* 48:2–51. Also, *N.J.S.A.* 48:2–42 provides that any person or public utility that fails to comply with an Order of the BPU is subject to a penalty of one hundred dollars for every day during which the default continues. Furthermore, under *N.J.S.A.* 48:2–13, its general grant of jurisdiction and authority, the BPU might revoke the franchise of a utility that fails to provide proper service, and substitute another utility.