# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0242-24

C.L.,

    Plaintiff-Appellant,

v.

BIG BROTHERS BIG SISTERS
OF AMERICA,

    Defendant-Respondent,

and

BIG BROTHER BIG SISTERS
OF SOMERSET COUNTY,

    Defendant.

_____

Submitted November 19, 2025 – Decided March 18, 2026

Before Judges Currier, Smith and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1512-21.

Anreozzi + Foote and Nagel Rice LLP, attorneys for appellant (Bradley L. Rice, of counsel and on the briefs; Nathaniel L. Foote, on the briefs).

Goldberg Segalla LLP, attorneys for respondent (David S. Osterman and Leo Capoferri, on the brief).

PER CURIAM

In February 1979, eleven-year-old C.L.[1] was allegedly sexually abused by Barry Rhudy ("Rhudy"), his mentor from Big Brothers and Big Sisters of Somerset County ("BBBSSC"), a local affiliate of a national charitable organization, Big Brothers and Big Sisters of America ("BBBSA"). Decades later, in 2021, C.L. sued both organizations for compensatory and punitive damages stemming from the assault. The Law Division granted summary judgment to BBBSA and dismissed the complaint. C.L. appealed.

Following our review of the record and after consideration of the pertinent legal principles, we affirm.

## I.

In September 1978, Rhudy became a Big Brother at BBBSSC. When he was approved, he had no criminal record and nothing appeared "in his background that should have raised questions or concerns" about his

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

A-0242-24

participation in the program. BBBSSC "matched" Rhudy with C.L. as his Little Brother. Rhudy took C.L. on a number of overnight and day excursions including a camping trip in February 1979 to Atlantic City. According to Rhudy, during the night, he unintentionally abused C.L., claiming he did so in a "state of half sleep." After Rhudy reported the incident to BBBSSC, he was suspended immediately and directed not to have any contact with C.L. until the investigation concluded. The matter was reviewed by local police and two prosecutor's offices but no criminal charges were filed.

In 1977, BBBSA initiated a study to address child sex abuse in youth-serving organizations. As part of that study, BBBSA sent a memo to its local affiliates asking each to report any allegations of assault so that BBBSA could "1) determine the incidence level; 2) analyze the patterns (if any) of this behavior; 3) develop National policy; and 4) provide guidance on volunteer selection and predictability." Later, BBBSA issued an undated memo containing updates on the study. The memo announced preliminary findings of the study and identified general similarities of Big Brother abusers. The memo acknowledged:

> From the specific cases [BBBSA] has been made aware of and from the research conducted in this area, we cannot expect to wholly prevent child molestation. However, we can strive to ensure that we are doing

3

everything within our power as a professional youth serving organization to be cognizant of the potential for child molestation, and to screen, match [,] and supervise [Big Brothers] and [Little Brothers] with the knowledge of that possibility.

The memo included BBBSA's recommendations for screening, supervision, and training, which required criminal background checks, submission of at least three references and two interviews before selecting an applicant, and increased supervision of the Big Brother/Little Brother relationship in the first six weeks. The memo did not identify any specific issue with overnight visits.

BBBSA published its findings in a 1983 publication titled "Child Sexual Abuse Prevention Training" (the "Wolff report"). The report described the profile of an abuser as compiled through the information it received. It also stated that "[s]ince most acts occur[r]ed at th[e] home of the volunteer early in the match, it is suggested that early overnight visitation be discouraged. Sleeping in one bed together and taking showers together should be absolutely prohibited." In the "Training Parents" section, it warned parents that a Big Brother insisting on overnight visits early in the match is a behavior that "might cause concern," and "sleeping in the same bed or sleeping bag" is a behavior that "should always cause concern." The report also provided a

4 A-0242-24

sample "Match Agreement" that "spells out the basic responsibilities for the [Big Brother/Big Sister], the parent, and the [Little Brother/Little Sister]" and includes guidance that "[o]vernight activities should not be considered prior to [three] months from the start of the match."

The relationship between BBBSA and BBBSSC was governed by a Provisional Membership Affiliation Agreement ("PMAA"). The PMAA provided that BBBSSC was an autonomous "independent contractor." BBBSSC agreed to adhere to BBBSA's minimum practice standards. However, BBBSSC

> was obligated to implement its own constitution and bylaws, set short- and long-term organizational goals, acquire funding, hire staff, establish personnel policies, and develop and implement policies for the administration of a volunteer youth mentorship program that would screen applicants, match them with clients, and supervise their relationship.

The PMAA and minimum practice standards were the only mandatory requirements local affiliates were required to follow. Adherence to suggestions included in other training and materials that were distributed by BBBSA were "voluntary." The parties agree BBBSA was not involved in BBBSSC's volunteer selection, screening process, or supervision of Big Brother/Little Brother matches.

5

A-0242-24

In 2021, C.L. sued BBBSA and BBBSSC and sought to recover damages from both organizations for their negligence, recklessness, "willful and wanton" acts and omissions; and negligent supervision, hiring, and retention. In February 2024, BBBSA moved for summary judgment. In a comprehensive written opinion, the motion judge granted that application and dismissed C.L.'s complaint with prejudice.

The motion judge concluded C.L.'s negligence-based claims could not be sustained because

> [t]here is no evidence that BBBSA had knowledge of any propensities of . . . Rhudy that made the sexual abuse of [C.L.] particularly foreseeable. Rather, it is undisputed that BBBSA was not involved in the hiring, training, or supervision of . . . Rhudy. In fact, there is no evidence that BBBSA had any contact with . . . Rhudy whatsoever. Therefore, the [c]ourt finds that BBBSA does not owe [C.L.] a duty under the standard of particularized foreseeability.

The motion judge dismissed C.L.'s negligence claim, finding BBBSA's role was limited to voluntary advice and training, and rejected vicarious liability because there was no causative link between Rhudy's Big Brother role and his misconduct. The court also dismissed claims of negligent hiring, supervision, and training, concluding BBBSA was not responsible for Rhudy

6

and found no evidence he posed a risk to C.L.  Finally, the court dismissed the punitive damages claim.

C.L. appealed and limited his issues to: (1) the existence of a duty of care owed to him by BBBSA; (2) the dismissal the negligent hiring, retention, and supervision claims; and (3) the denial of the request for punitive damages before a trial on the matter occurred.

## II.

"We review a trial court's decision on a motion for summary judgment de novo, 'applying the same standard used by the trial court.'"  Obiedzinski v. Twp. of Tewksbury, 480 N.J. Super. 45, 60 (App. Div. 2024) (quoting Samolyk v. Berthe, 251 N.J. 73, 78 (2022)).  The applicable standard

> requires the court to review the evidence in the light most favorable to the non-moving party, and to enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
>
> [Allen v. Cape May Cnty., 246 N.J. 275, 288-89 (2021) (first quoting R. 4:46-2(c); and then quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995)).]

"To the extent that the grant or denial of summary judgment is based on an issue of law, we owe no deference to an interpretation of the law that flows from established facts." State v. Perini Corp., 221 N.J. 412, 425 (2015) (citing Town of Kearny v. Brandt, 214 N.J. 76, 92 (2013)).

III.

We first address the threshold issue of whether BBBSA owed a duty of care to C.L. To succeed on any negligence claim, "plaintiff must show that a defendant owed the injured party a duty of care." Pfenninger v. Hunterdon Cent., 167 N.J. 230, 240 (2001). "[T]he question whether there is a 'duty' merely begs the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." J.S. v. R.T.H., 155 N.J. 330, 338 (1998) (quoting Weinberg v. Dinger, 106 N.J. 469, 481 (1987)). The question as to whether BBBSA owed a duty to C.L. and, if so, whether C.L. has a cognizable claim based on an alleged breach of it, is purely a legal issue. See e.g., id. at 337.

"Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists." Ibid. (citing Williamson v. Waldman, 150 N.J. 232, 239 (1997)). "[W]here the nature of the risk or the extent of harm is difficult to ascertain, [the] foreseeability [assessment] may require that

A-0242-24

the defendant have a 'special reason to know' that a 'particular plaintiff' or 'identifiable class of plaintiffs' would likely suffer a 'particular type' of injury." Id. at 338 (citing People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 262 (1985)). "Foreseeability . . . is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis." Ibid. (citing Weinberg, 106 N.J. at 484-85). That knowledge may be either actual or constructive. Ibid. (citing Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 576-77 (1996)).

If the risk of harm comes from a third person, "a plaintiff may be required to prove that defendant was in a position to 'know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person [ ]' that was 'likely to endanger the safety' of another." Ibid. (alterations in the original) (quoting Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 507 (1997)).

C.L. asserts BBBSA owed him a duty of care because the risk of sexual abuse to minor participants at BBBSA-affiliated locations was generally, rather than particularly, foreseeable to the organization. We disagree and conclude our current jurisprudence requires we consider the existence of a

duty of care under the "particularized foreseeability" standard established in

J.S.

The duty analysis is "rather complex" and requires the trial court to

> weigh[] and balance[] several, related factors, including the nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution.
>
> [J.S., 155 at 337 (citing Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).]

Initially, we note the severity of the harm in this case cannot be overstated. C.L. alleges he was the victim of sexual molestation by a person to whom trust was bestowed to ensure C.L.'s positive social development and safekeeping. The clear public policy favoring protection of children from sexual abuse, and the Legislature's action to effectuate it, was addressed at length in J.S., id. at 343-49 and is incorporated here. However, even severe harm and a clear public policy is not a sufficient basis for imposing a duty unless the harm is foreseeable.

Following J.S., for a defendant to be liable for the actions of a third party, a plaintiff must prove "defendant was in a position to 'know or have

reason to know, from past experience, that there [was] as likelihood of conduct [on their part]' that was 'likely to endanger the safety' of another." Coleman v. Martinez, 247 N.J. 319, 339 (2021) (first alteration in original) (quoting J.S., 155 N.J. at 338). Measured against the standard of this particularized foreseeability standard, we conclude the evidence is insufficient to warrant imposition of a duty on BBBSA.

While we acknowledge that BBBSA could inspect affiliates for compliance and could offer training and guidance to them, the record also reflects it had no direct contact with affiliates' volunteers nor its clients. BBBSA also did not supervise nor participate in the volunteer screening or matching process. The PMAA establishes the affiliates are responsible for the supervision of the mentor-mentee relationship.

In addition, the record reflects the affiliates managed their own programs, policies, and personnel while concurrently adhering to minimum standards set by BBBSA. Therefore, as the motion judge correctly found, it is reasonable to conclude BBBSA could not have objectively foreseen that Rhudy would have caused any harm to C.L. because BBBSA did not hire, train, nor supervise Rhudy. Similarly, BBBSA was not involved in Rhudy's

A-0242-24

vetting process and the record reveals that BBBSA was not even aware of Rhudy's existence or his participation in the BBBSSC program.

Additionally, despite C.L.'s argument that BBBSA "voluntarily undertook an effort to study the prevalence of sexual abuse within its local affiliates and create policies and procedures to address that specific risk of such sexual abuse in its local affiliates" when it opened an inquiry to allegations of sexual abuse, this did not trigger the creation of any duty of care.

The record reveals that BBBSA began to collect information about the issue of child sexual abuse in 1977. However, this largely involved fact gathering as it pertained to a nascent issue. That research could not undermine the already existing contractual nature of the relationship between BBBSA and its affiliates.

## IV.

Second, the motion judge correctly dismissed BBBSA's negligent supervision and hiring claims. These claims are based on the "direct fault" of an employer. G.A.H. v. K.G.G., 238 N.J. 401, 415 (2019). The tort of negligent hiring has two fundamental requirements. Id. at 416. An aggrieved

A-0242-24

plaintiff first must show, irrespective of whether the employee was acting within the scope of his or her employment:

> (1) that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury."
>
> [Ibid. (quoting Di Cosala v. Kay, 91 N.J. 159, 173 (1982)).]

Similarly, the tort of negligent supervision or training similarly requires that the employer "knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm" and the "risk of harm materializes and cause[d] the plaintiff's damages." Ibid.

Here, BBBSA was neither involved in the hiring nor in the supervision of Rhudy. That undisputed responsibility contractually belonged to BBBSSC that possessed the exclusive responsibility for screening the applicants and supervising the relationships. Therefore, BBBSA cannot be held liable for negligently hiring and/or supervising, when it never performed those roles.

13

C.L. also asserts that BBBSA is liable under a vicarious liability theory based on Rhudy's apparent authority to act on behalf of BBBSA. This argument lacks merit.

"[V]icarious liability for an employee's torts committed outside the scope of employment is limited to 'situations in which the principal's liability is based upon conduct which is within the apparent authority of a servant.'" E.S. for G.S. v. Brunswick Inv. Ltd. P'ship, 469 N.J. Super. 279, 304 (App. Div. 2021) (emphasis omitted) (quoting Restatement (Third) of Agency § 219 cmt. e). However, "[a]pparent authority rarely serves as a basis for liability when an employee . . . commits an intentional physical tort." Id. at 303 (quoting Restatement (Third) of Agency § 7.08 cmt. b). This is because there must be "some nexus between the principal's manifestation of authority and the agent's tortious conduct." Id. at 304. In E.S., the court declined to find vicarious liability where a landlord's maintenance worker sexually assaulted a child at the residence. Id. at 305. The court reasoned that

> the motion record demonstrated that defendant authorized [the maintenance worker] to act as its agent to make repairs and otherwise maintain the Commercial Avenue property. That is the only authority that plaintiff and her family could have reasonably relied upon in permitting him access or otherwise not objecting to his access. To hold defendant vicariously liable for [the maintenance

14

worker]'s heinous criminal conduct, plaintiff was required to demonstrate that defendant provided Fred with more than "merely the opportunity" to commit the crime. Peña [ v. Greffet], 110 F. Supp. 3d [1103,] 1135 [(D.N.M. 2015)].[2] There was no such proof in this case.

[Ibid.]

The facts in E.S. are similar to those here and we are guided by its reasoning in concluding there is no vicarious liability claim here. Assuming Rhudy is an agent of BBBSA, he was authorized and expected to mentor C.L. Like the situation in E.S., mentorship is the only authority that plaintiff "could have reasonably relied upon" in his participation in the program. Ibid. Plaintiff cannot show that BBBSA provided Rhudy with more than "merely the opportunity" to commit this crime. Ibid. Also, Rhudy was not an agent of BBBSA but of BBBSSC. Therefore, the trial court properly dismissed plaintiff's vicarious liability claim.

V.

Lastly, C.L. argues because the other claims should not have been dismissed, the punitive damages claim also should not have been dismissed at the summary judgment stage. We disagree.

---

[2] The court cited a federal case from New Mexico to explain the development of the Restatement, which governs New Jersey's law on apparent authority.

15

"[T]o sustain a punitive damages claim, '[a] plaintiff must demonstrate a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.'" Rivera v. Valley Hospital, Inc., 252 N.J. 1, 18 (2022) (quoting Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 405 (App. Div. 2005)) (internal quotation marks omitted). Punitive damages may not be awarded for mere negligence or gross negligence. N.J.S.A. 2A:15-5.12(a). Similarly, a searching review of the record reveals no evidence that BBBSA acted in any intentional or reckless way to harm C.L. that would justify a punitive damages award.

To the extent we have not addressed any of C.L.'s remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0242-24